Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212
Telephone: (503) 223-7400
Facsimile: (503) 751-2071

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TSUTOMU SHIMOMURA,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>　　　　　　　　Defendant. | Case No. 3:22-cv-455-SB<br><br>PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52(a)<br><br>*Request for Oral Argument* |

## TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

I.   Introduction ................................................................................................ 1

II.  Discussion .................................................................................................. 3

    A.  Mr. Shimomura's Medical Record Establishes His Disability ................. 3

        1.  Mr. Shimomura is a highly accomplished physicist
           and computer expert and was a founder and the
           CEO of Neofocal ............................................................................ 4

        2.  Mr. Shimomura developed PCS after suffering a
           TBI in 2006, but continued to work as Neofocal's
           CEO for the next ten years ............................................................ 4

        3.  Mr. Shimomura became disabled by PCS as the result of an
           August 2016 MVA ......................................................................... 5

             a.  Mr. Shimomura suffered new and increased PCS
                symptoms that disable him as a result of the
                MVA ........................................................................... 6

             b.  Mr. Shimomura worked from December 2016
                to May 2017, but was unable to adequately
                perform, even with reduced hours and duties ..................... 9

             c.  Mr. Shimomura was disabled through the
                close of the record ............................................................ 10

        4.  Dr. Lewis opined that Mr. Shimomura is disabled
           from his Regular Occupation as the result of PCS
           resulting from the August 2016 MVA ......................................... 16

             a.  Dr. Lewis explained that concussions have a
                cumulative effect ............................................................. 18

             b.  Dr. Lewis explained that Mr. Shimomura is credible ........ 18

    B.  Unum Erroneously Denied Mr. Shimomura's Disability Claim. ............. 19

        1.  Unum erred by concluding that Mr. Shimomura is
           not disabled from his regular occupation of CEO ..................... 20

a.  Unum misleadingly implied that the MVA was
    minor and that Mr. Shimomura functioned well
    afterwards.................................................................20

b.  Unum erroneously cited the absence of scans
    and cognitive tests as supporting denial............................23

c.  Unum erroneously cited the absence of migraine
    treatment and of referrals to sleep and neurology
    specialists as supporting denial.........................................27

d.  Unum erroneously cited Mr. Shimomura's
    pre-existing PCS symptoms as supporting denial.............28

2.  Unum has not met its burden of proving that it was
    prejudiced by late claim filing ....................................29

a.  Unum erroneously asserted that the relevant
    time frame to determine prejudice is 2016 ......................30

b.  Unum was not prejudiced by lost opportunity to
    obtain a contemporaneous IME or NPE ..........................30

c.  Unum was not prejudiced by lost opportunity to
    contemporaneously review, speak with
    Dr. Lewis or interview Mr. Shimomura............................31

d.  Unum was not prejudiced by lost opportunity to
    conduct contemporaneous surveillance ...........................33

C.  Unum Should Be Ordered to Approve and Pay
    Mr. Shimomura's Claim ...............................................34

III.  Conclusion ...........................................................35

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases**

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).................................................. 3

**U.S. Court of Appeals Cases**

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997).................................... 33

*Chang v. Liberty Life Assur. Co.*, 247 Fed. Appx. 875 (9th Cir. 2007)................................. 29

*Oregon Schools Activities Ass'n v. Nat'l Union Fire Ins. Co.*,
279 Fed Appx. 494 (9th Cir. 2008)........................................................................ 30

**U.S. District Court Cases**

*Giberson v. Unum Life Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 186496
(S.D. W.Va. Oct. 12, 2022)................................................................................ 33

*Holmgren v. Sun Life & Health Ins. Co.*, 354 F. Supp. 3d 1018 (N.D. Cal. 2018) ............................. 33

*LaVertu v. UNUM Life Ins. Co. of Am.*, 2014 U.S. Dist. LEXIS 40442
(C.D. Cal. Mar. 25, 2014) ................................................................................ 33

*Mardirossian v. Guardian Life Ins. Co. of Am.*, 457 F. Supp. 2d 1038 (C.D. Cal. 2006)................... 29

*Pfluger v. U.S. Grp. Long-Term Disability Ins. Plan*, 2007 U.S. Dist. LEXIS 3161
(E.D. Wis. Jan. 16, 2007)................................................................................ 34

**State Court Cases**

*Lusch v. Aetna Casualty & Surety Co.*, 272 Ore. 593, 538 P. 2d 902 (1975)....................................... 29

**Other Authorities**

29 U.S.C. § 1104................................................................................................ 34

29 U.S.C. § 1132(a)(1)(B) .................................................................................... 1, 3

Fed. R. Civ. Pro. 52(a) ...................................................................................... 1, 35

OAR 836-010-0026 ............................................................................................ 3

## I.    INTRODUCTION

Pursuant to Fed. R. Civ. Pro. 52(a), plaintiff Tsutomu Shimomura moves for judgment based upon the record for judicial review. Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), under a *de novo* review, Mr. Shimomura seeks an order declaring that he has proved by a preponderance of the evidence that he is disabled from his "regular occupation" as Chief Executive Officer ("CEO") under the terms of the Neofocal Systems, Inc. long-term disability policy, insured by defendant ("Unum").

Mr. Shimomura is a 58-year-old physicist and computer expert. He has consulted with major corporations and the United States government regarding computer security and other highly technical issues. He established Neofocal in 2003. In 2006, Mr. Shimomura sustained a traumatic brain injury ("TBI") when he was struck in the head by a pipe that was dropped by a retail store employee. In late 2006, with continuing symptoms, he established care with psychiatrist Dr. Thomas Lewis. Dr. Lewis diagnosed postconcussive syndrome ("PCS"). Despite cognitive problems and other PCS symptoms, Mr. Shimomura continued to work as Neofocal's CEO for the next decade. He remained under the care of Dr. Lewis, who documented the symptoms and treatment recommendations. In the 4½ years from February 2012 to August 2016, Mr. Shimomura saw Dr. Lewis five times and emailed him once, while working continuously as Neofocal's CEO.

In August 2016, Mr. Shimomura sustained a second TBI when the car he was driving was rear-ended by another vehicle. He called for an ambulance and was taken to the emergency room. The next day he reported recurrence and worsening of PCS symptoms to Dr. Lewis. His PCS symptoms persisted. The 2016 motor vehicle accident ("MVA") was the straw that broke the camel's back. While Mr. Shimomura had performed his occupational duties despite residual

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

symptoms before the second TBI, he was unable to do so after it. A five-month attempted return

to work was unsuccessful despite reduced duties and hours. Mr. Shimomura remained under Dr.

Lewis's frequent care with disabling symptoms through the close of record in the fall of 2019.

Dr. Lewis explained that Mr. Shimomura is credible and has not exaggerated his symptoms.

Unum denied Mr. Shimomora's claim, asserting based upon file reviews that he is not

disabled from his regular occupation of CEO. Unum implied the accident was minor and cited

the *absence* of various scans, tests, clinical findings and referrals as supporting denial. Unum

also asserted that Mr. Shimomura had worked for years before the MVA despite PCS symptoms.

Dr. Lewis responded in detailed letters. He explained that it *cannot be emphasized*

*enough* that PCS is caused by microscopic injury that occurs at the axonal level and is diagnosed

clinically, not by scans and tests, and that this is how he diagnosed Mr. Shimomura, consistent

with medical authority. He also explained that it *cannot be emphasized enough* that TBIs have a

cumulative effect and that Mr. Shimomura is disabled as the result of successive TBIs. Dr.

Lewis's treatment notes and discussions, backed by medical authority, show that he is an expert

in TBI/PCS. Unum ignored his opinion and medical authority and repeated, in subsequent file

reviews and its final denial letter, assertions he had refuted. The only analysis of Dr. Lewis's

detailed letters is a five bullet point addendum by Unum's final file reviewer.[1]

Based upon the assertions of two of its consultants, Unum also claimed prejudice from

late filing and denied his claim on this basis. Unum asserted that it would have taken certain

actions had timely notice been provided. However, Unum's consultants asserted the incorrect

time for evaluating prejudice in making their assertions. They identified actions Unum would

---

[1] That addendum, by Dr. Jacqueline Crawford (R. 1097), is addressed on pp. 22-23, 28-29, 32, *infra*.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

have taken had it received notice in the fall of **2016**, rather than the relevant time of the fall of **2017**, in accordance with the policy's claim submission deadline of one year after injury. Unum's consultants did not identify a single action that Unum – which has the burden of proving notice-prejudice – would have undertaken in the fall of 2017 that it could not have undertaken as effectively in the fall of 2018, when the claim was submitted. Unum's assertions of prejudice are also contrary to medical science and the record. Accordingly, Unum has not met its burden of proving prejudice from late claim filing. Mr. Shimomura asks the Court to order Unum to approve and pay his LTD claim, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

## II.    DISCUSSION

### A.  Mr. Shimomura's Medical Record Establishes His Disability.

"A denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is...reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Neofocal LTD policy does not grant discretion to Unum, and in Oregon, where Neofocal purchased the policy, discretionary clauses have been banned. OAR 836-010-0026. Accordingly, the applicable standard of review is *de novo*.

Under a *de novo* review, Mr. Shimomura has met his burden of proving by a preponderance of the evidence that "due to… sickness," he is "limited from performing the material and substantial duties of [his] regular occupation" as CEO and "ha[s] a 20% or more loss in [his] indexed monthly earnings due to the same…injury." R. 90, 108[2] ("Disabled" and "Regular Occupation" policy provisions); *See* R. 482-483 (Unum's summary of occupational duties, loss of earnings, and LTD benefit amount).

---

[2] This motion cites the pages of the record for judicial review (Dkt. #15) as "R. _."

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

### 1. Mr. Shimomura is a highly accomplished physicist and computer expert and was a founder and the CEO of Neofocal.

Mr. Shimomura is a 58-year-old physicist and computer expert. R. 127, 131.

…At approximately age 18, he entered the California Institute of Technology where he studied physics with Nobel Laureate Richard Feynman and worked as a research associate for theoretical physicist and mathematician Stephen Wolfram. While at Caltech, Mr. Shimomura also did research at the neighboring Jet Propulsion Laboratory. After only two years at Caltech, he was recruited to become a staff physicist at the Los Alamos National Laboratory where he remained through 1992…He has been a consultant to various Silicon Valley firms, international corporations and the United States government on issues of computer security and other highly technical areas.

R. 1083. He was a founding director and the CEO of Neofocal, a fabless semiconductor company. R. 47 (Employer Statement), 480.[3] As CEO, his "regular occupation" (R. 90, 108), he had "ultimate executive responsibility for every aspect of" the corporation's "ongoing funding and operation, including leadership and collaboration with staff, investors, and legal and financial professionals." R. 480-481; *See* 482-483 (Unum's summary of CEO's duties).

### 2. Mr. Shimomura developed PCS after suffering a TBI in 2006, but continued to work as Neofocal's CEO for the next ten years.

In 2006, "Mr. Shimomura [] suffered a significant traumatic brain injury when he was struck on the posterior side of the head by a falling metal pipe" while at a Home Depot store. R. 1084 (Dr. Lewis), 154 (Dr. Lewis's clinical note: "Home Depot"; "struck post L side"; "Fell"; "Does not know. LOC. Remembers being on the floor a while later…Confused, disoriented when came to."), R. 42 (9/10/18 disability form). Mr. Shimura was diagnosed with a concussion and with post-concussive syndrome. R. 1084.

---

[3] A fabless company designs and sells semiconductor chips and outsources manufacturing. *See* https://www.wise-geek.com/what-is-a-fabless-company.htm (last accessed 11/6/22)

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

In late 2006, Mr. Shimomura established care with Dr. Lewis, a diplomate of the American Board of Psychiatry and Neurology and Assistant Clinical Professor at the University of California, San Francisco School of Medicine. R. 771. Dr. Lewis explained to Unum:

> Mr. Shimomura sought me out in late 2006, and reported that he was continuing to suffer difficulties in focus, concentration, memory and executive function. He described his feeling "laziness" as "I want to think, but I can't." He reported that he had experienced trouble dialing the phone because he would get numbers mixed up. He also reported new onset of mood lability and depression, impaired ability to sleep at night and impaired ability to stay awake during the day.

R. 1084 (9/9/19). Mr. Shimomura remained under Dr. Lewis's care. From 2012 through 2016, he saw Dr. Lewis approximately once a year, while working full time as Neofocal's CEO. *See* R. 823 (Dr. Lewis, 3/7/18: "Had been seeing me very infrequently before the 2nd TBI."), R. 180-210, 161-166 (Dr. Lewis's 2006-2015 records).

On October 12, 2015, the last visit before the August 2016 MVA, Mr. Shimomura was doing "mostly pretty good," his stress level was "mostly OK" and business was "pretty good." R. 166. His mood was "generally good," anxiety was "up and down" and sleep disruption was "largely successfully addressed" with prescribed Xyrem. *Id*. Dr. Lewis noted, "HGH continues to [] appear efficacious at reducing cognitive complaints" and "[s]tress vulnerability continues, with notable susceptibility to social stress. Impaired executive function continues." *Id*.

### 3. Mr. Shimomura became disabled by PCS as the result of an August 2016 MVA.

On August 9, 2016, Mr. Shimomura suffered a second TBI when he was rear-ended by a car after he stopped at a traffic light near the Portland airport. The force of the collision pushed his vehicle forward and it collided with another car. R. 286 (Mr. Shimomura's accident report). Mr. Shimomura called 911 for an ambulance, moved his vehicle out of traffic, exchanged information with the other drivers and called his rental car company to report the accident. *Id*. He

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

was taken to Providence Hospital, where he was diagnosed with cervical strain, abdominal pain,

acute headache and hypertension, and was prescribed Flexeril, a muscle relaxant, and oxycodone

for pain. R. 279-281.

> ### a. Mr. Shimomura suffered new and increased PCS symptoms that disabled him as the result of the MVA.

The day after the MVA, Mr. Shimomura completed a DMV accident report (R. 294-297)

and sent an email to Dr. Lewis, describing the accident and his symptoms and seeking his

medical advice:

> I was involved in an auto accident yesterday afternoon - my rental car in Portland was rear ended while I was stopped, with sufficient force to knock my sunglasses off my head (including the strap I always have them on so I can hang them around my neck), they were found in the backseat. The impact pushed me into the stopped car several meters in front of me with enough force to damage both vehicles. I'm guessing that the driver that hit me was going at traffic speed, maybe 20-30 KPH.

> Got C-collared by EMS at the scene as I had some point tenderness slightly lateral of midline, near C5-C7 on the left and C8-C7 on the right. Got discharged from the ED a bit before midnight after C-spine and abdominal CTs. No obvious C-spine bone-injury, and no obvious abdominal bleed. Some bilateral paresthesia in both elbows and hands, which seems to be slowly resolving. Beyond the expected musculoskeletal symptoms I feel pretty bruised inside, breathing is uncomfortable, and I still have some LLQ - ULQ abdominal tenderness and guarding.

> Took Flexeril and Celebrex for the obvious reasons.

> Basic neuro checks are OK, but **I'm having the same loopy ("lather rinse repeat") and scattered cognitive function, poor executive function, and lethargy, as I did after my TBI. Oh, and inability to multitask effectively. I'm also dropping and bumping into things. I don't how much to attribute to the meds, but I'm guessing that I may have suffered more brain injury – is this likely or plausible given the mechanism of injury?** These symptoms were present before I took the Flexeril - also interesting that 10mg of Flexeril didn't make me sleepy at all.

> My plan had been to fly to Hong Kong from SFO very late Thursday (tomorrow) night, wondering if this is a good idea. I expect I'll have more of a sense later

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

today - let's see how long it takes me to write this email and get myself out of this hotel this morning.

Do you have any suggestions for me? …

R. 167 (emphasis added). Dr. Lewis responded the next morning, explaining that he could not

see Mr. Shimomura that day, but that "there [are] some things I'd like you to do" and noted:

> NAC 900 mg BID
> Alpha-lipoic acid 600 mg BID
> EPA Ultimate 1/day
> Also minocycline 100 mg BID, for which you'll need a prescription…
> There may be some other things too after I review my TBI database.

*Id*.

On September 16, 2016, Mr. Shimomura saw Dr. Lewis, who summarized:

> …**Starting with the accident patient noted recurrence of scattered cognitive function, poor executive function, lethargy, inability to multitask, dropping things, bumping into things, headache; all familiar to him from his prior experience of TBI**.
>
> Plan had been to fly to Hong Kong. Had some business meetings where he had to show up but did not have to do much...
>
> If he gets stressed, then finds he can't do anything. Error rate is very high on a lot of things that he is used to doing very well. Has trouble putting in his contacts - getting the right lens in the right eye (correct eye) is difficult…Has found all the permutations to put clothes on incorrectly - shirt inside out, or backwards. "It's annoying, it's frustrating, it's kind of scary."...
>
>   Has noticed some thermoregulation problems. Drenched in sweat after Mexican food - pronounced since the MVA and random - "all of a sudden, I'll feel hot, or I'll feel cold." Some teeth chattering.
>
>   Still has vertigo, comes and goes. Tinnitus hasn't changed much. Has trouble expressing self clearly.
>
>   Tried modafinil, Adderall, Focalin since they worked last time. Noted he [] had some depression as well - tried Wellbutrin; it seemed to help but it leaves him kind of scattered. Adderall better than Focalin so far.
>
>   Early on, modafinil didn't help last time, and this time it doesn't help at all. May be too early in the course. Adderall + Wellbutrin helps, but suppresses appetite significantly. If doesn't take it, task initiation is low.
>
>   Is better than he was 1 month out from Home Depot TBI.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

> Has hip pain and neck pain from the MVA - took oxycodone for pain →
> constipation and sluggish and inert, tending toward depression. Paresthesias better
> in arms. Pain walking still, in chest.
> **Again, situations with social contact are much more draining tha[n]**
> **before the MVA, as with Home Depot TBI.**
> Low appetite with weight loss, because lots of things don't appeal to him. A lot
> of people comment that he is fatigued.

R. 168 (emphasis added). Dr. Lewis noted that Mr. Shimomura was "on leave" and documented

cognitive difficulties:

> …has tried to do some technical work, like chip layout work, took 10x longer
> than it should have, making mistakes and having to correct his mistakes. Can't tell
> from moment to moment if he is being attentive or not. This am, when putting
> contact lenses in, discovered he already had them in. Unable to prioritize.
> Has been avoiding tasks that are particularly frustrating for him.

*Id*. Dr. Lewis's impression was:

> **Past h/o TBI**, with subsequent mood instability, stress susceptibility, disrupted
> sleep, and a wide range of cognitive deficits, including substantial difficulty with
> attention and executive function. Sleep disruption was largely successfully
> addressed with the Xyrem.
> **Now with resumption of former symptoms upon repeat episode of TBI** from
> MVA.

R. 169 (emphasis added). He recommended that Mr. Shimomura continue taking the

supplements and prescribed trials of several medications. *Id.*

Dr. Lewis documented two instances in which Mr. Shimomura exhibited forgetfulness

during the September 16 appointment:

> [**Remembered a part of the story he forgot to tell me**] When he got back from
> China, saw he couldn't perform work tasks and was impaired. Took 2 weeks off to
> see [if] his condition would get better; plan was to do that and reassess; he was
> more calm and not as frenetic upon return, but not better able to do work tasks. He
> and colleagues agreed that he was still impaired after 2 weeks and should go on
> leave.
> ***
> **After patient had left, he came back about 10 minutes later because he**
> **realized he had left his case behind, which indeed he had**.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

R. 168 (emphasis added).

### b. Mr. Shimomura worked from December 2016 to May 2017, but was unable to adequately perform, even with reduced hours and duties.

Mr. Shimomura returned to work from December 20, 2016 through May 23, 2017,[4] with "[v]ery limited" hours, "[a]pprox. [z]ero to four" per week (R. 43 (Unum LTD claimant form)), but "was impaired" and "not very functional." R. 72 (Unum telephone note). *See* R. 170-174 (office reports, 12/12/16-5/15/17). On January 31, 2017, Dr. Lewis noted:

> Task completion is problematic; jumps from task to task; ends up doing a lot of task-switching. Is used to multi-ta[s]king, but now "the previous task is forgotten."...
> \*\*\*
> Continues to lose things frequently - loses things every trip he takes.
>   Tried Adderall, and Dexedrine; both made him sleepy. Provigil did not prevent this effect. DA agonist helped last time, but not this time…
> \*\*\*
> Post injury, he needs more sleep. Usually, about 5 hours, 5.5 hours would leave him feeling rested; now it's 6-7 hours; feels like he has a hard time getting enough sleep. Xyrem works well…Sometimes he forgets to turn out the light, goes to sleep with it on, and then sleep can be poor. Xyrem exacerbates motion sickness.

R. 171.

On February 27, 2017, Mr. Shimomura told Dr. Lewis that he had "[h]anded in resignation as CEO 2½ weeks ago." R. 172. Dr. Lewis noted:

> Gets stressed by work, then it takes him days to recover from it. Not sure how much can be dealt with through pharmacology. Stressful interaction w/ main investor took him 7 days to get over. Seems like it's getting cumulatively worse. Felt tired, exhausted, wanting to sleep all day, no energy, not able to engage. Overwhelmed. Very low energy, very tired. Slept 16-20 hours per day, lying in bed most of the time; had little wherewithal to do much. Mood was flat.

*Id*.

---

[4] A "recurrent disability" is one that occurs within six months after a return to work and is treated as a continuation of the same disability. R. 98 (policy).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

On May 15, 2017, Mr. Shimomura felt "'like I'm recovering'" and "'like I'm able to function some portion of the time'" and that "cognitive function and focus is improving." R. 174. He was not "get[ting] stressed out as easily." *Id*. Dr. Lewis noted, "Exercise improves mood for him substantially. Mood has largely been good, even with work stressors." *Id*. Mr. Shimomura was "off SRI altogether." *Id*. However, on May 22, 2017, he explained to Dr. Lewis by email:

> As we both noted I seem to be improving but the stresses of dealing with the dysfunction at my company seem to [be] overwhelming me. I've been home and tried to relax a bit, and everything fell apart – I'd been exhausted, I think this is telling me that I'm doing too much. Think I am a little depressed right now, which makes sense given the stressors. I'll adjust to take care of that very soon, maybe tomorrow.
>
> ***
>
> Something I noticed was that the stress level was transferring to doing non-work projects (including ADL, but really stuff I should enjoy more), and I was having a hard time making decisions, executive functioning, socializing, and all that. Hope I can make this improve soon, this is not fun.

R. 175.

On June 19, 2017, Mr. Shimomura had "been on leave since [May 23rd]." R. 176. Dr. Lewis noted:

> Slope of improvement has inverted in last 2 months, patient reports: is worse rather than better. ↑ Emotional lability, including at work. In household projects, making multiple mistakes in measurements or calculations. "My error rate remains very high." "That's there and it's definitely discouraging." "When I can't put contact lens in correctly, I guess I shouldn't really expect to perform at a high cognitive level." "I'm doing better now than I was 2 or 3 weeks ago," which he attributes to "being out of the line of fire."

*Id*. Dr. Lewis's impression was "Had been slowly getting better, until recent worsening which appears to be due to elevated work stress…" *Id*.

### c. Mr. Shimomura was disabled through the close of the record.

Dr. Lewis documented Mr. Shimomura's symptoms and limitations in his chart notes:

### July 24, 2017:

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

COGNITION: Forgot to take medication today.

  Taking Provigil Nuvigil 2:1. "It's hit or miss; some days it works and some days it doesn't." Still gets stressed out easily; recovery time has ↓ from days to a day. Improving in that respect. "It still feels like something that's really bad for me and I shouldn't be doing it." Loses focuses [sic] and things; mood stable. Being able to make progress on something helps him feel better - traveling is helpful because hotel rooms are not cluttered. His home is cluttered. Because he had such trouble with losing/misplacing things, he eventually ended up buying another of something for every item he lost/misplaced, which made the clutter problem worse. **The amt of work it takes for him to keep organized is more than he can do**.

IMPRESSION: …**Being on leave has ↓ his symptoms. Is contemplating return as CEO; unclear to me that he can realistically function at that level**.

R. 177 (emphasis added).

**October 6, 2017:**

Patient himself is still on leave - appointed a board. Litigation pending vs. Eric. Board appointed him CEO, although he is on leave.
***
"I've been pretty challenged over the past few months." "I feel like my ability to deal…I'm definitely getting stressed out easily, and in many cases it lasts for days afterwards." Had planned to go on a trip but found it very difficult to get everything together to go, couldn't organize himself in a satisfactory way, and this was stressful. Took him a while to recover from this. Was having trouble focusing or getting anything done, feeling overwhelmed. After the stress feeling goes on for a while, he gets depressed…Also relies on cognitive reward/problem solving for his life satisfaction. "If I could make orderly progress, I think I'd be OK."

Is feeling better today than 2 weeks ago - getting more rest helped. Notes he is usually spontaneous and flexible; now that is hard for him. "I feel like I can't just keep making efforts to do things where I am just flailing. **Notes he has gotten irritable and angry with people who frustrate him, which is unusual for him. Stress tolerance is way down**. "I'm trying to find just little things I can finish." …"I can push and push but at some point things fall apart."

"My mood feels OK for now - it hasn't always over the past months." "**I think I felt better in December than I do now**."

R. 178 (emphasis added).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

**December 4, 2017:**

When stressed, gets mood instability - not just depression. "I can stand back and watch it, and notice my mood is swinging."...

 Is having some cognitive reward in trying to get the company moving again. Work environment remains stressful with high level of conflict…

 **He is not up to the job of being a CEO, patient reports. Try[ing] to be the CEO was impairing his recovery; he's on leave but is still officially the CEO. Day to day operations are being handled by 2 other people; he is trying not to be involved in the day to day and letting others handle that.**

R. 826 (emphasis added).

**January 19, 2018:**

His father is seriously ill in Japan…which is a major stressor for Tsutomu currently…

Continues to note slow improvement in stress tolerance.

R. 825.

**January 22, 2018** (Dr. Lewis, requesting medical plan's authorization of Xyrem):

He is making slow but gradual improvements and remains significantly impaired at this time. Xyrem continues to be a mainstay of his treatment.

R. 808-09.

**March 7, 2018:**

Arrived "frazzled" from airport; just back from a trip. Stress intolerance continues. Stress tolerance (before TBI) "used to be a complete non-issue for me. I used to be very stress resistant." "I need more sleep now." Can sleep with Xyrem; w/o Xyrem, sleep remains problematic. Mood nowadays: "I think I'm doing OK right now" with respect to mood. Is doing "absentee CEO" work, i.e., not the full job of the CEO, but as many parts of it as he thinks he can manage...Work environment remains stressful…There was a conference call he completely forgot about, which is of course unlike his functional level prior to TBI…

 **Productivity continues to be low. "The meds help, but…" "I'm not good at rushing - if I rush, then things just completely to hell." "When there are too many things to do, I lose track."**

 **Notices he ends up on his computer with literally 100s of browser windows open - loses track of where the one thing he's working on is. That happened**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

**in previous TBI, and went away after about 1 year. This phenomenon returned after the most recent TBI, and thus far it has not gone away…**
  **Puts in a lot of time in order to get anything done - estimates his effectiveness at 1/10th of his former. Will get distracted on one problem, and forget what else he was working on.**
  **When goes to check his work, finds multiple errors, feels he is just "chasing my tail."**
  In this TBI, initial rate of recover[y] was faster than the for 1st one - but **now he has plateaued, …and hasn't been making notable progress in the past year. Notes cognitive "laziness."**
8/10/16 - MVA. Initial arrangement w/ board was to wait and see if he could recover. He thought he might get better in a week. 30 days later, 9/7/16, hadn't recovered much and went on short term disability because it was clear he could not do the job. Spent a couple of weeks trying to brief…acting CEO, on what to do…Had been seeing me very infrequently before the 2nd TBI. Things that didn't come back after first TBI - visual memory. Has had no dream recall for x 5 years.

R. 823 (emphasis added).

**April 5, 2018:**

Ongoing complaints of difficulty with focus, follow-through, executive function with respect to sorting out complex problems.

R. 822.

**June 18, 2018:**

He's still having problems handling stress. On modafainil/r-modafinil, notes some rebound fatigue. Gets him unstuck, and definitely provides some protection vs. stress. His stress resilience is improving but slowly. Still has a lack of focus. Focused on too many different things in a short period of time, still way too many windows open on the browser. Modafinil "lets me get moving," helps him do something, but what he focuses on may not be what he needs to do. Does not help with prioritization per se. Continues to have trouble getting things done.
 Has had fewer of the "Stressed and can't work" days. Has been intermittently compliant with HGH - off it, notes more cognitive slowing.

R. 821.

**July 16, 2018:**

A trial of clonazepam may be worthwhile for anxiety…
  Leaves this evening for Asian trip to check on father. Mood fairly good. Affect euthymic. Remains stressed easily; effectiveness of modafinil R/L mix is

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

declining. Could use it for 30 days straight, but now not nearly as effective. Less focused than he'd like. Work stress remains high.
  Sleep with Xyrem works well…

IMPRESSION: …Slowly improving.

R. 820.

**September 18, 2018** (Unum disability claim form):

Patient continues to suffer from significant cognitive deficits, impaired memory, sleep disruption, and impaired executive neurological functions. These deficits impair his ability to interact effectively with colleagues, business associates, and others, especially in situations requiring close or sustained attention or focus. They also impair his ability to undertake and complete significant multivariate technical analyses in his profession.

Patient should exercise caution in undertaking tasks requiring close attention or focus, especially when fatigued or stressed.
*** 
There is no cure for TBI. Rather, symptoms are managed through medications, rest (especially adequate sleep) and avoidance of physical or situational stresses that exacerbate symptoms and dysfunction.

R. 64.

**October 8, 2018:**

Getting into Uber - driver took off while he was half in the car. Fell onto ground. Has knee pain. Now suspects ACL tear. Needs MRI to assess.
*** 
Is in pain now. Chronic pain is also depressing for him…

If he can't get out and do things, depression sets in quickly- in a matter of days…

Continues on R modafinil and R/L modafinil for daytime wakefulness, executive function…

R. 819.

**October 22, 2018:**

MRI done on knee last week → pelvis + R knee.
*** 

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

Has been using Provigil/Nuvigil mixture for executive function. Indian generic form of Provigil is only erratically effective. He still develops tolerance within a few days. Campral was helping; isn't helping as much now. Is needing more of that to function; the rebound is more pronounced. General level of stress is moderately high. Pain in the knee increased the level of his stress....

R. 818.

**November 2, 2018:**

MRI → no ACL tear but complex tear of meniscus.
  Surgical approach to this situation likely.
  Continued to review non-opioid analgesic possibilities.

R. 817.

**January 3, 2019:**

Since last appointment injured shoulder - Uber pulled out, he fell; has b/l shoulder pain.
  Crutching may consequently be a problem. Scheduled for knee surgery late Feb.
  May need shoulder repair prior to knee repair…

R. 815.

**January 28, 2019:**

Sleep - used to only need 5 hours per night. Recently notes increase in how much sleep he needs. Shoulder pain is interfering with sleep…

Mood - notes some renewed depression. Work environment stressful - company is close to running out of money…Stress very high, "which I'm sure isn't good for me." Has been much less physically active than usual, which may well contribute to current status. If he walks around for a day, often cannot walk at all the next day due to knee pain.

Has been using Provigil/Nuvigil/Campral combination for executive function, finding the efficacy dwindles swiftly due to tolerance. May be useful to try combining with Trintellix, especially given recent increase in depression.

Weight - up and down, over a range of 15 pounds. Weight is stress sensitive.
                                                   ***
Knee surgery currently scheduled for Feb. 27.
                                                   ***
PLAN: re-trial of Trintellix for cognition, depression.

Megan E. Glor, Attorneys at Law
                                                   707 NE Knott Street, Suite 101
                                                   Portland, OR  97212

R. 813-814.

### 4.  Dr. Lewis opined that Mr. Shimomura is disabled from his Regular Occupation as the result of PCS resulting from the August 2016 MVA.

In August 2018, Dr. Lewis noted on Unum's disability claim form a primary diagnosis of PCS, and secondary diagnoses of sleep and mood disorders due to a medical condition. R. 63. He stated that Mr. Shimomura "continues to suffer from significant cognitive deficits, impaired memory, sleep disruption, and impaired executive neurological functions" and that "[t]hese deficits impair his ability to interact effectively with…others, especially in situations requiring close or sustained attention or focus [and] also impair his ability to undertake and complete significant multivariate technical analyses in his profession." R. 64. He added, "Patient should exercise caution in undertaking tasks requiring close attention or focus, especially when fatigued or stressed." *Id.* Regarding a treatment plan, he stated: "There is no 'cure' for TBI. Rather, symptoms are managed through medications, rest (especially adequate sleep) and avoidance of physical or situational stresses that exacerbate symptoms and dysfunction." *Id.*

Dr. Lewis wrote three letters responding to assertions by Unum's consultants – dated March 25, 2019 (responding to internist Dr. Maribelle Kim's assertions/questions), June 24, 2019 (responding to neurologist/psychiatrist Dr. Stephen Selkirk's assertions) and September 9, 2019 (responding to neurologist Dr. Jacqueline Crawford's assertions). R. 888-891 ("March 2019 Response"), 1019-1033 ("June 2019 Response"), 1081-1089 ("September 2019 Response").

In his March 2019 Response, Dr. Lewis explained that Mr. Shimomura had been disabled from his Regular Occupation since the MVA:

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

With respect to the mental demands of Mr. Shimomura's job as CEO of a technology start-up company, **it is my opinion that he was (and continues to be) completely unable to perform adequately the functions of that job**, which include the activities you mention ("directing, controlling or planning activities of others; influencing people in their opinions, attitudes, and judgments; making judgments and decisions; dealing with people; performing a variety of duties; sustained concentration and attention; making work decisions (ability to make simple work-related decisions); understanding and memory for both short and detailed instructions; independent planning; public and peer interaction.") In addition, because Mr. Shimomura was the CEO of a technology start-up, he was called upon to participate actively in highly technical problem-solving activities regarding the specific technology products the company was developing. **He was similarly unable to perform these activities as well.**

**It is my opinion that Mr. Shimomura was unable to perform these duties because of the decrements in his executive function capacity and his stress response capacity produced by the TBI he suffered in the motor vehicle accident in 2016.**

\*\*\*

**It was my opinion then [after the accident], and it still is today, that Mr. Shimomura was suffering from a persistent post-concussive syndrome produced by the motor vehicle accident.**

R. 888-890 (emphasis added).[5]

In his September 2019 Response, Dr. Lewis reiterated that the MVA had caused PCS with

ongoing disabling cognitive impairment:

It is my considered opinion as his treating physician that Mr. Shimomura suffered a second traumatic brain injury in the 2016 auto accident that manifested as persistent post-concussive syndrome with pronounced impairment of his working memory, his ability to focus and concentrate, and to interact effectively with others. These and related cognitive abilities are often described as "executive function." **It is my clinical assessment that as a result of the repeated TBI in the 2016 accident Mr. Shimomura became [unable] to perform the cognitive demands required in his occupation, and that he achieved no significant or lasting improvement since that time.**

R. 1089 (emphasis added).

---

[5] Contrast Dr. Lewis's description of Mr. Shimomura's "Regular Occupation" with generic statements by Dr. Kim that downplayed the cognitive demands. R. 858, 904.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

### a. Dr. Lewis explained that concussions have a cumulative effect.

Dr. Lewis noted in nearly every office note that TBIs have a cumulative effect:

> IMPRESSION: Past h/o TBI, with subsequent mood instability, stress
> susceptibility, disrupted sleep and a wide range of cognitive deficits, including
> substantial difficulty with executive function. Sleep disruption was largely
> successfully addressed with the Xyrem.
> Now with the resumption of former symptoms upon repeat episode of TBI from
> MVA. **The literature is clear that TBIs exert a cumulative effect, perhaps
> through the persistence of higher levels of proinflammatory or pro-apoptotic
> factors, which appears not to return to baseline levels, or in some cases do
> not, even after years**.

R. 169 (emphasis added). *See also,* e.g., R. 171, 177, 826, 820, 815, 813. In his September 2019

Response, Dr. Lewis explained it "cannot be emphasized highly enough" that

> **…the effects of…("TBI"), including concussion injuries, are *cumulative*. In
> other words, a person who suffers a traumatic brain injury, even after
> recovering from that first injury, is left far more vulnerable to suffering new,
> renewed, or worse impairment(s) from any subsequent TBI, even if that
> second TBI is "mild."**
>
> **This is a fundamental aspect of current medical understanding of TBI…**
>
> Mr. Shimomura suffered a significant TBI in August 2006 when he was st[r]uck
> in the head by a falling pipe. The auto accident of 2016 was his second TBI. Dr.
> Crawford's file review appears to indicate that she was not made aware of the first
> accident.

R. 1082 (italics in original, bold added).

### b. Dr. Lewis explained that Mr. Shimomura is credible.

In his March 2019 Response, Dr. Lewis opined, based upon his interactions with Mr.

Shimomura for more than ten years, that Mr. Shimomura is credible:

> Of course, in any clinical situation in which symptoms are largely reported
> subjectively, careful attention must be paid to the possibility that an individual
> patient may exaggerate or over-report symptoms and/or symptom severity. **In the
> case of Mr. Shimomura, I can find no evidence of such over-reporting or
> exaggeration**. Moreover, **Mr. Shimomura is a person who derives enormous
> life satisfaction from the exercise of his very substantial intellect. It appears**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

**to me that he has (unsuccessfully) tried to work during periods when it was simply not possible for him to be effective at work, chiefly owing to his intense desire to be working. He does not strike me as the sort of person who enjoys not working - quite the opposite. If it were at all possible for him to be working as the CEO of a technology start-up company, I very much suspect that this is exactly what he would be doing**.

R. 891 (emphasis added). He reiterated his opinion in his July 2019 and September 2019

Responses. R. 1033, 1089. In the latter, he also stated: "I have found Mr. Shimomura's reports of

his symptoms to be clinically credible and **consistent with the current medical understanding**

**of cumulative TBI and its cognitive effects**." *Id.* (emphasis added).

### B. Unum Erroneously Denied Mr. Shimomura's Disability Claim.

Dr. Kim asserted in her March 26, 2019 memo that based upon the "currently available

records and given that this is a late file, it is **unclear** whether" Mr. Shimomura "was/is" disabled

from his occupation **and recommended further review**. R. 904-905 (emphasis added).[6] In his

April 4, 2019, memo (the "further review"), Dr. Selkirk stated that he "Concur[ed]" with Dr. Kim

that "there was no evidence to support that the claimant was precluded from work at a sustained

full-time level from 8.9.16 forward." R. 947. He did not read her memos (R. 904, 857, 880)

closely enough to see that she had not reached a conclusion as to whether Mr. Shimomura was

disabled. Nor was "sustained full-time level" the correct standard under Mr. Shimomura's

"regular occupation" coverage. *See* pp. 3, 16-17, *supra*.

Dr. Selkirk asserted that specific findings, treatments and tests were lacking, and that

some symptoms were present prior to the MVA as the bases for his conclusion. R. 947-948. He

did not address Dr. Lewis's March 25 Response (R. 888-891) in his April 4 memo.

---

[6] Dr. Kim had made the same assertion to Dr. Lewis on 3/4/19, and posed questions. R. 857-858. In her March 26 memo she *documented* his March 25 Response that refuted her assertions (R. 888-892), but did not *analyze* it and reiterated her assertions verbatim. R. 904-905.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

On April 24, 2019, relying upon the Kim and Selkirk reviews, Unum denied Mr.
Shimomura's claim, asserting that the medical record did not establish that he had been disabled
from his "regular occupation" as CEO since the August 2016 MVA and that Unum had been
prejudiced by late claim filing. R. 962-968.

Mr. Shimomura appealed Unum's denial. R. 1017-1018. His appeal included Dr. Lewis's
June 2019 Response, in which he explained that Dr. Selkirk had misstated the nature of TBI and
PCS and explained how PCS is diagnosed, manifests and is treated. His Response also refuted
Dr. Selkirk's assertions about lack of specific findings, citing medical authority. R. 1019-1033.

Unum then engaged Dr. Crawford, who reiterated many of the assertions made by Drs.
Kim and Selkirk and made additional assertions of prejudice in a bulleted list. R. 1055-1058
(7/24/19). Like Drs. Kim and Selkirk, she did not discuss Dr. Lewis's earlier Responses. Dr.
Lewis refuted Dr. Crawford's assertions in his September 2019 Response. R. 1081-1089 (9/9/19).
Dr. Crawford then issued a five-bullet addendum to justify several of her prior assertions. R.
1097. On October 1, 2019, Unum affirmed its denial decision, parroting many of its consultants'
assertions. R. 1107-1116.

    1.  **Unum erred by concluding that Mr. Shimomura is not disabled from his regular occupation of CEO.**

        a.  **Unum misleadingly implied that the MVA was minor and that Mr. Shimomura functioned well afterwards.**

Drs. Selkirk and Crawford cited the fact that Mr. Shimomura did not lose consciousness
in the accident (R. 948, 1057), the absence of "trauma to the head (e.g. abrasion, ecchymosis)"
(R. 948) and his ability to move his car, call 911 and his car rental agency and "complete a form
with details of the accident" (R. 1057) as evidence his injuries from the MVA were minor. Dr.
Crawford asserted that the ER provider did not diagnose a concussion/TBI (R. 1057) and that

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

Mr. Shimomura did not follow after-visit advice to "see a primary care provider within five

days..." R. 1057.[7] She also cited his going ahead with a planned trip to Hong Kong in support of

denial. *Id*. Unum repeated these claims in its denial letters. R. 965, 1109, 1111-1112.

Dr. Lewis refuted these assertions. He explained in his June 2019 Response that the fact

Mr. Shimomura did not lose consciousness in the MVA is immaterial:

> Loss of consciousness (LOC) is not required for the diagnosis of concussion/
> mTBI.[8] The diagnosis permits a LOC extending from 0 to 30 minutes, which
> obviously includes patients with no LOC at all (i.e., a LOC duration of 0
> minutes). Clearly the inclusion of "0 minutes" of LOC in the diagnostic criteria of
> patients with mTBI is neither arbitrary nor accidental: **Patients can and do
> undergo mTBI events that do not result in LOC but nevertheless produce
> brain dysfunction and lasting symptoms**.

R. 1029 (emphasis added). He found Dr. Selkirk's statement regarding the absence of "abrasion"

or "ecchymosis" to be "lacking in medical substance to a degree that I find startling." R. 1030.

He explained:

> **Many, many years of medical research have amply demonstrated that the
> head itself need not be physically struck in order to produce brain damage**.
> The requisite event for mTBI requires kinetic energy to be imparted to the human
> body in a way that makes the brain move suddenly and sharply, whether the head
> itself is struck or not. Thus, **patients can be concussed by the forces imparted
> to the brain by sudden acceleration/deceleration, as in a car accident in
> which they remain seat-belted in the vehicle and the head does not strike any
> solid object**.

*Id*. (emphasis added).

In his September 2019 Response, he explained that Dr. Crawford's "Analysis/Rationale"

was based upon "medically specious reasoning, non-sequiturs, and baseless speculation." R.

---

[7] This assertion by Dr. Crawford is absurd. Mr. Shimomura emailed Dr. Lewis the next day
seeking his medical advice. R. 167. He had no reason to see a primary care doctor when his
treating provider of 10 years was a psychiatrist and TBI/PCS expert.
[8] TBI is also referred to as mTBI.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

1082. Responding to her observation that "Mr. Shimomura was able to pull his rental car off the

road and into a parking lot to call 911 and to wait for an ambulance…" (*id*.), Dr. Lewis stated:

> Dr. Crawford appears to consider this to be some evidence that he did not suffer a
> concussion in the accident, despite his complaints of confusion, neck pain and
> abdominal pain and difficulty breathing. As I have explained to Unum…, **serious
> concussions do not always (or even usually) result in a loss of consciousness**.
> Anyone who has watched a professional football game can appreciate that
> observation, and all medical professionals certainly must.

*Id*. (emphasis added). Responding to Dr. Crawford's assertion that successfully filling out an

accident report "with details…was consistent with preserved consciousness, anterograde and

retrograde memory, problem solving and visuospatial skills" (R. 1083), Dr. Lewis explained:

> It appears to me that filling out the Oregon form shows no such things. The form
> consists largely of writing out his name, and checking pre-printed boxes… Mr.
> Shimomura attached a half-page summary of the accident.[] I understand that Mr.
> Shimomura was assisted in writing it, but even if he had done so by himself, the
> writing itself shows nothing of significance to a professional medical assessment.
> I hope that an individual's ability to check boxes or fill out a simple form is not
> genuinely being advanced as the basis for suggesting he can function as a senior
> business executive.

*Id*.; *See also* 294-297 (accident report). Dr. Crawford responded in her bulleted addendum,

asserting that Mr. Shimomura's ability to fill out the DMV form showed he did not have amnesia

– a symptom he had not asserted. R. 1097.

Dr. Lewis also responded to Dr. Crawford's assertions that "Mr. Shimomura – against

[Dr. Lewis's] medical advice – chose not to cancel his scheduled flight to Hong Kong to meet

with his investors" and that there was no evidence "in the file" as to "how well Mr. Shimomura

was actually able to function mentally on that trip." R. 1082-1083. Dr. Lewis referred Unum to

documentation that Mr. Shimomura had significant difficulty during and after the trip:

> ...my contemporaneous medical notes (which Dr. Crawford claims to have read)
> document that shortly after his trip, Mr. Shimomura reported to me that he was
> able to show up to meet with his investors, but left most of the discussion to

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

others because he felt his thinking and concentration to be "scattered." My
medical notes in September, 2016 also reflect that Mr. Shimomura reported
continued difficulty with [] simple things such as putting on his clothes in the
right direction, and that he was suffering dizziness and thermoregulation
disruption since the accident.

R. 1083; *See also* R. 168. He also explained:

…Dr. Crawford reasons that "international travel…requires tolerance for complex
visual stimuli, ability to interact with others and problem-solve." I do not
understand what she means by this, and I do not understand it typically to be
especially cognitively taxing to sit in an airplane seat or thereafter to take a taxi to
a hotel.

*Id.*[9] Unum repeated its consultants' assertions in its final denial letter. R. 1109, 1111-1112.

### b. Unum erroneously cited the *absence* of scans and cognitive tests as supporting denial.

Dr. Kim pointed to the absence of "mini-mental status exams," "neuropsychological

testing" and "diagnostic imaging of the brain" in asserting to Dr. Lewis that it was "unclear"

whether Mr. Shimomura was disabled by the MVA. R. 857. Dr. Lewis responded, explaining:

"The diagnosis of persistent post-concussive syndrome is a clinical one; it is not made by

findings from neurological exam, CT scanning, or MR imaging." R. 890 (March 2019

Response). "[N]one of these measures," he explained, "reliably assesses the presence or absence

of abnormal brain functioning induced by mTBI events" adding, "medical science has simply not

advanced to the point where clinical tests are available that reveal the abnormalities of brain

function that are certainly present in many brain disorders." *Id.*[10]

---

[9] Dr. Crawford's arbitrary response to this discussion (R. 1097) is discussed on p. 32, *infra*.
[10] Dr. Crawford's later assertion that the ER providers were not "sufficiently concerned about
possible brain injury" to order a brain CT reveals her lack of expertise. R. 1057. It is also
meritless given Mr. Shimomura's manifestation of common TBI/PCS symptoms by the day after
the MVA. *See* R. 167.

Megan E. Glor, Attorneys at Law
                                                707 NE Knott Street, Suite 101
                                                Portland, OR  97212

He also explained: "In my opinion, obtaining cognitive testing on Mr. Shimomura would

not be clinically illuminating." *Id*. Addressing executive function, a primary barrier to Mr.

Shimomura's ability to perform his occupational duties as CEO, Dr. Lewis explained that the

Mini Mental Status Exam "does not assess executive function" and that "[e]ven formal

neurocognitive testing would not be useful in Mr. Shimomura's case":

> Neurocognitive testing might be able to tell me if Mr. Shimomura's executive function
> has been adversely affected to the point where it is below the normal range. However,
> such testing could not tell me whether he has had a *decrement* in executive function that
> might impair him from performing a highly demanding job, like being a CEO. It seems
> very likely to me that Mr. Shimomura's executive function capacity has typically been
> well above average, which has allowed him to excel at extremely difficult cognitive tasks
> that would be well beyond the ability of the average person to perform. If an event like a
> mTBI reduced his executive functioning by 20%, for instance, he might still be in the
> normal range as assessed by cognitive testing, and he might still be unable to perform
> adequately in a work position that routinely demands executive function capacity that is
> not merely normal but superlative.

R. 890-891 (emphasis in original). He added:

> In those medical conditions where useful and informative objective medical tests are
> lacking, the diagnosis is established by reference to the question: what is the clinical
> syndrome most consistent with the history of the illness and its signs and symptoms? In
> Mr. Shimomura's case, in my opinion, the diagnosis most consistent with the known facts
> is persistent post-concussive syndrome.

*Id*.

Days later, Dr. Selkirk asserted, without discussion of Dr. Lewis's analysis: "CT after the

[MVA] reportedly showed no acute abnormality" as supporting denial. R. 948.[11] Dr. Lewis

responded once again:

> I must say that it saddens me to read a report, written by a physician in 2019, in
> which a normal CT result could be plausibly advanced as evidence of the absence

---

[11] The only CT after the MVA was of Mr. Shimomura's knee, in 2018. R. 579. Dr. Selkirk
obviously did not review the medical record and Unum repeated his statement in its denial. R.
965.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

of brain injury in the context of mTBI. Such a contention is at least twenty years
out of date with medical research and practice in this area.[12]

First, the modern definition of mTBI presupposes that brain imaging findings, if
obtained, are normal…

Second, abundant medical evidence documents that patients can and do have
brain dysfunction after concussion that is not detected by CT or MR. In fact,
CT/MR results are *usually* normal in concussed patients. As the Ontario
Neurotrauma Foundation *Guidelines* state: "Computed Tomography (CT) and
conventional Magnetic Imaging (MRI) usually fail to detect evidence of structural
brain abnormalities in mTBI."

Diffuse (or multifocal) axonal injury is a process that occurs at the cellular and
axonal level, a microscopic scale not visualized by the current resolution
capabilities of CT or MRI…

R. 1028 (June 2019 Response). He cited the Department of Veteran Affair/Department of

Defense (VA/DOD)'s *Clinical Practice Guideline For Management Of Concussion/Mild*

*Traumatic Brain Injury* ("*VA Practice Guideline*"), which "specifically recommend[s] *against*

using brain imaging such as CT or MR in an attempt to evaluate, diagnose or monitor patient

progress in mTBI." R. 1029 (emphasis in original) ("'We suggest against using the following

tests to establish the diagnosis of mTBI or direct care of patients with a history of

mTBI…Unfortunately, at this time, evidence does not support the use of any laboratory, imaging

or physiological test for these purposes.'").

Dr. Selkirk also cited the absence of "neurological deficit, including abnormal cognitive

function, at encounters dated [14 office visits]" (R. 947) and of "documentation…of abnormal

cognitive function on office-based tests" as supporting denial. R. 948. In response, Dr. Lewis

explained that Dr. Selkirk's "remarks appear to rest on a foundational assumption that cognitive

---

[12] ***After*** purportedly reading this discussion by Dr. Lewis (R. 1055), Dr. Crawford asserted that
the ER providers were not "sufficiently concerned about possible brain injury" to order a CT. R.
1057. This was nonsensical given Mr. Shimomura's manifestation of mTBI/PCS symptoms the
day after the MVA. R. 167. Her assertions reveal bias and/or a stunning lack of expertise.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

testing in mTBI is clinically desirable, informative, and constitutes part of the routine care for

such patients" – but that "[t]his assumption is false":

> [t]here is simply no convincing evidence that cognitive or neuropsychological
> testing is clinically useful in this cohort of patients, or that such testing improves
> patient outcomes.

R. 1026. Referring again to the *VA Practice Guideline,* he explained that the United States

military is "[t]he organization that has had perhaps the most experience with mTBI patients" and

that the *VA Practice Guideline* is "one of the most comprehensive resources on the management

of mTBI patients." *Id.* The *VA Practice Guideline,* he explained, not only "find[s] no evidence of

utility in cognitive testing in mTBI management," but "explicitly and strongly advise[s] *against*

obtaining such testing":

> **"We recommend against using the following tests in routine diagnosis and**
> **care of patients with symptoms attributed to mTBI: a. Comprehensive and**
> **focused neuropsychological testing**…"

*Id.* (emphasis in original). He explained that according to the *VA Practice Guideline*, "'The

diagnosis of mTBI is a clinical diagnosis, relying predominantly on patient history.'" *Id.* "In Mr.

Shimomura's case," he stated:

> …the issue of whether his cognitive status has declined from his baseline is
> certainly relevant. Because cognitive testing will not tell me what I need to know,
> I glean it, as I must, from the history and my impression of the patient. My
> records of Mr. Shimomura's treatment do not contain the results of cognitive
> testing, because that information is not clinically useful. My records do contain
> exquisitely detailed information about the nature and progression of the cognitive
> deficits experienced by Mr. Shimomura as related to me through the information
> channel that is of singular utility in the diagnosis and treatment of mTBI, which is
> the clinical history.

> Refuting Dr. Selkirk's reference to the fourteen office visits (R. 1026), he added:

> Every encounter referenced by Dr. Selkirk contains information about Mr.
> Shimomura's cognitive function.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

R. 1027-1028. *See* pp. 7-15, *supra*, and R. 168-179, 813-826 (Dr. Lewis 9/16/16 to 1/28/19).

      **c.  Unum erroneously cited the absence of migraine treatment and of referrals to sleep and neurology specialists as supporting denial.**

Dr. Selkirk asserted that "[t]he severity and frequency of reported…headaches are not corroborated by clinical data," and that there are "no emergent encounters for severe, unremitting headaches" or "aggressive pharmacological treatment with standard migraine…medications." R. 947. These *absences* are immaterial to whether Mr. Shimomura is disabled by PCS from the 2016 MVA. Dr. Lewis explained:

> First, I have never contended that Mr. Shimomura is disabled from performing his occupation on the basis of headache severity, so I have no idea as to why this information can be thought relevant to a determination of his disability status. Second, I have no idea as to why notations in the medical record regarding migraines would be thought to be relevant, since the headaches provoked by mTBI are typically not migraines, and there is no reason to suppose that a post-concussion headache would respond to migraine preventative or abortive medications.

R. 1030-1031 (June 2019 Response).

Unum's consultants' assertions about sleep dysfunction were also irrelevant. R. 947 (Dr. Selkirk: "The severity and frequency of reported sleep dysfunction … are not corroborated by clinical data"; no "formal diagnosis of a sleep disorder based on diagnostic testing."); 1057 (Dr. Crawford: no referral to a sleep clinic). Dr. Lewis explained:

> [Dr. Selkirks's] statement appears to rest on a foundational assumption that diagnostic testing, (i.e., a sleep study such as an overnight polysomnogram) is necessary prerequisite for the diagnosis of every sleep disorder, or even most sleep disorders, or even the specific sleep disorder that Mr. Shimomura actually has. Such an assumption is quite demonstrably false.

R. 1031 (June 2019 Response). He listed "all the sleep disorders for which diagnostic testing is routinely appropriate" according to the American Academy of Sleep Medicine's *Practice Parameters* and observed, "Mr. Shimomura has never been alleged to have any of the sleep

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

disorders on the list…" *Id.* He noted that the *Parameters* state that insomnia, the sleep disorder

Mr. Shimomura has, is "primarily diagnosed clinically with a detailed medical, psychiatric, and

sleep history'" and confirmed, "[t]hat is precisely the manner in which…Mr. Shimomura's

insomnia is established in my treatment of him, as reflected in the medical record." R. 1032.

The consultants' assertions that Dr. Lewis did not make referrals to a neurologist or for

cognitive rehabilitation are spurious. R. 857 (Dr. Selkirk), 1057 (Dr. Crawford). Dr. Lewis is a

psychiatrist and, as his Responses establish, a TBI/PCS expert. As Mr. Shimomura's treating

psychiatrist for over a decade, he was in the ideal position to decide whether referrals were

indicated. There is no evidence to support that any evaluation or treatment could resolve Mr.

Shimomura's subtle, persistent cognitive problems resulting from successive mTBIs.

### d. Unum erroneously cited Mr. Shimomura's pre-existing PCS symptoms as supporting denial.

Unum's consultants cited the fact that Mr. Shimomura had been treated for PCS

symptoms of mood destabilization, sleep problems and cognitive problems since the 2006

accident as supporting claim denial. R. 857, 858 (Dr. Kim), 948 (Dr. Selkirk), 1057, 1097 (Dr.

Crawford). Dr. Kim cited abnormalities on a 2012 brain MRI "consistent with sequelae of prior

posterior head injury." R. 857. Dr. Selkirk noted that such symptoms were present prior to the

MVA and asserted that "[n]ew symptoms were not clearly documented after the [MVA]." R. 948.

Dr. Crawford stated that Mr. Shimomura had "functioned in the vocational setting for many years

despite similar complaints…" and had taken "the same medications before and after the 8/9/16

MVA." R. 1057. In her addendum, she asserted that he had a "high cognitive reserve" – shown

by his return to work after the 2006 accident – as evidence he could have also returned to work

after the 2016 MVA. R. 1097. She also cited his work as Neofocal's CTO after the MVA. *Id.*

While Mr. Shimomura had performed his occupational duties for nearly ten years after his 2006 accident, he could not do so after the second TBI, despite his desire and efforts in his failed return to work bid. *See* pp. 9-10, *supra*.[13] In disregard of the record and literature about cumulative effect of successive TBIs, Unum erroneously denied his claim. R. 965, 1112.

### 2. Unum has not met its burden of proving that it was prejudiced by late claim filing.

The Supreme Court holds that "the notice-prejudice rule applies to prevent an insurer from initially denying a late claim that was untimely submitted unless the insurer shows actual prejudice." *Chang v. Liberty Life Assur. Co.*, 247 Fed. Appx. 875, 877 (9th Cir. 2007) (citing *UNUM Life Ins. Co. of Am. v Ward*, 526 U.S. 358, 365-66 (1999)). "Under Supreme Court precedent, a state notice-prejudice rule is effectively deemed to be [a] term of the ERISA insurance contract." *Mardirossian v. Guardian Life Ins. Co. of Am.*, 457 F. Supp. 2d 1038, 1043 (C.D. Cal. 2006). Oregon's notice-prejudice rule was established in *Lusch v. Aetna Casualty & Surety Co.*, 272 Ore. 593, 599-600, 538 P. 2d 902 (1975):

> Summarizing, we conclude that the **first inquiry should be whether the notice of accident was received in time for the insurer to make a reasonable investigation** and adequately protect its interest and that of the insured. Stated conversely, **the first inquiry should be whether the insurer was prejudiced by the insured's failure to give earlier notice of the accident.** If notice from any source was sufficiently timely so that the insurer could adequately investigate and protect itself, thereby suffering no prejudice, the insurer is bound to fulfill its policy obligations. Whether the insured acted reasonably is immaterial.
>
> If the insurer was not prejudiced, the "second inquiry" — "whether the insured acted reasonably in failing to give notice at an earlier time," is not reached.

---

[13] Unum's assertion that Mr. Shimomura's five-month return to work, from December 20, 2016 to May 23, 2017, undermines his claim is meritless. R. 1113. Mr. Shimomura worked "very limited" hours, "approx. [z]ero to four" per week with reduced duties during this failed return (R. 43) and was paid disability pay. R. 270-272. In 2018, he was reimbursed insurance premiums (R. 469-478), reflected by total earnings of about $4,000 for the year. R. 469.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

(emphasis added); *See Oregon Schools Activities Ass'n v. Nat'l Union Fire Ins. Co.,* 279 Fed

Appx. 494, 495 (9th Cir. 2008) ("The notice-prejudice rule ...provides that an insurer may not

deny coverage due to the insured's failure to give timely notice unless **the insurer can show** it

was prejudiced thereby." (emphasis added)). Unum's notice-prejudice claim fails on the first

inquiry because Unum has not shown prejudice.

> ### a. Unum erroneously asserted that the relevant time frame to determine prejudice is 2016.

Dr. Kim asserted: "[t]ypically, **if this file were reviewed in 2016**, in order to determine

the insured's functional capacity...we would have taken numerous actions..." R. 264. Dr.

Crawford stated, "**If notice of claim had been timely provided from 9/2016 to 12/2016**, we

would have..." R. 1056 (emphasis added). However, neither consultant addressed the relevant

time frame for assessing prejudice; rather they just assumed it was in 2016.

The Unum consultants got it wrong – the relevant time is August 9, 2017. Unum drafted

into the policy a deadline of "one year after the date your disability begins" to submit a claim R.

80; *See* R. 1108. By its own drafting, Unum agreed that – at the claimant's option – Unum's

claim review would not begin until one year after the onset of disability. Thus, in Mr.

Shimomura's case, the applicable date to assess Unum's claim of prejudice is August 9, 2017,

one year after the MVA, not the fall of 2016, as Unum's consultants asserted.

> ### b. Unum was not prejudiced by lost opportunity to obtain a contemporaneous IME or NPE.

Dr. Lewis stated that neurocognitive testing "could not tell me whether he has had a

*decrement* in executive function that might impair him from performing a highly demanding job,

like being a CEO," explaining, "[i]f an event like a mTBI reduced his executive functioning by

20%, for instance, he might still be in the normal range as assessed by cognitive testing, and he

might still be unable to perform adequately in a work position that routinely demands executive

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

function capacity that is not merely normal but superlative." R. 890-891. *See* p. 24, *supra*. Unum's consultants did not refute this and their assertions about TBI and PCS in general reveal their lack of expertise. *See* pp. 20-29, *supra*.

Unum also failed to prove that cognitive testing in the relevant time frame – August 2017 – would have provided material information that was unavailable in August 2018, when Mr. Shimomura filed his claim. Dr. Crawford confirmed this herself by asserting in her **July 2019** file review that a "**current**[14] IME would not be time-relevant to 8/9/16-12/9/16" because "[t]he natural history of mTBI is for maximal symptoms in the hours and days after injury with **gradual improvements over weeks to months**, with the grand majority of individuals **resolving to baseline within three months**." R. 1056 (emphasis added). *See also* R. 904 (Dr. Kim, March 2019: "Typically, **if this file were reviewed in 2016**,…we would have recommended..likely a referral for neuropsychological testing"; "**[a] neuropsych IME done now/currently**[15] would provide information regarding his **current functional capacity**. It would not be able to determine his functional capacity starting from 8/9/16 forward." R. 904 (emphasis added)).

### c. Unum was not prejudiced by lost opportunity to contemporaneously review, speak with Dr. Lewis or interview Mr. Shimomura.

Unum also erroneously cited lost opportunity to conduct a contemporaneous interview with Mr. Shimomura or Dr. Lewis as prejudicial. R. 1056. Given Dr. Lewis's comprehensive, detailed documentation of Mr. Shimomura's symptoms in his records and Responses, and the

---

[14] Dr. Crawford's "current" was July 2019 but the relevant issue was whether an NPE in August 2017 would have provided material information as to disability in August 2016. Unum did not meet its burden of proof because it never addressed that. Dr. Crawford's error is underscored by her additional statement that "...an evaluation nearly **three years** after the index event [i.e., in July 2019] would not reflect the insured's status as of 8/9/16-12/10/16." *Id*. (emphasis added).
[15] Dr. Kim's "now/currently" was March 2019, 18 months after the relevant time frame of August 2017.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

fact Mr. Shimomura's symptoms would have plateaued within a few months of the August 2016 MVA (according to Unum), Unum's assertion that it was prejudiced by not being able to interview Dr. Lewis or Mr. Shimomura "contemporaneously" in 2016 is meritless.

Nor did (or can) Unum point to "more detailed information about symptoms, treatment, and activity before and after the 8/9/16 MVA" (R. 1047), that it could have gathered in interviews with Mr. Shimomura and Dr. Lewis in or around August 2017, that it could not have obtained in August 2018, when he filed his claim.[16]

Unum's utter disregard of Dr. Lewis's opinion in three detailed Responses and its repetition of the same flatly erroneous assertions confirm that Unum was not prejudiced, but that Unum actively avoided the truth about his condition.

Unum also erroneously asserted in a file note that an "ILTPC [initial telephone call with claimant] was not completed with the claimant based on attorney involvement in the initial review." R. 1042. Mr. Shimomura's counsel informed Unum of his representation on September 14, 2018 (R. 36), and offered, "If there is anything else Unum needs from us, please let us know." R. 37.

Unum called Mr. Shimomura twice, in late October and early November 2018, and left voice messages. R. 134, 135. Twenty minutes after the second call, Unum called his attorney, who asked to be the point of contact. R. 136. According to the record, Unum never asked to interview Mr. Shimomura. Even in lists of "Information We Need From You" (R. 144, 424),

---

[16] Dr. Crawford stated in her addendum that Mr. Shimomura's "9/16/16 report to Dr. Lewis regarding his feelings of being scattered while in Hong Kong were noted, but were not independently verified, a problem with late filing." R. 1097. The way to verify how he felt while in Hong Kong would have been to ask him or Dr. Lewis, which Unum could have done any time after he filed his claim.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

Unum did not include an interview. Nor did Unum respond to Mr. Shimomura's lawyer's

repeated requests that Unum advise if further information was needed. R. 153, 490, 556, 1003.

Unum knows to require an interview when it wants one. *See, e.g., Giberson v. Unum Life*

*Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 186496, at *21 (S.D. W. Va. Oct. 12, 2022) ("In

connection with his appeal, Unum interviewed Giberson..."); *LaVertu v. UNUM Life Ins. Co. of*

*Am.*, 2014 U.S. Dist. LEXIS 40442, at *15 (C.D. Cal. Mar. 25, 2014) ("...Unum performed its

first field interview, spending about an hour in Plaintiff's home asking her questions."). The

Ninth Circuit holds, "If the plan is unable to make a rational decision on the basis of the

materials submitted by the claimant, it must explain what else it needs. *Id.* If ERISA plan

administrators want to enjoy the deference to which they are statutorily entitled, they must

comply with these simple, common-sense requirements embodied in the regulations and our

caselaw." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997).

### d.  Unum was not prejudiced by lost opportunity to conduct contemporaneous surveillance.

Dr. Crawford identified "[p]ossible surveillance of the insured" to "determine [his] work

capacity" as an action Unum would have taken had his claim "been filed in a timely fashion" in

asserting prejudice. R. 1056.

The assertion of prejudice is meritless, not only because Dr. Crawford failed to address

the relevant time of August 2017,[17] but also because surveillance would not reveal material

information about whether Mr. Shimomura, who had no physical restrictions (*see* R. 64), could

exercise high-level cognitive functions effectively, as required in his regular occupation of CEO.

*See, e.g., Holmgren v. Sun Life & Health Ins. Co.*, 354 F. Supp. 3d 1018, 1033 (N.D. Cal. 2018)

---

[17] *See* p. 30, *supra*.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

(surveillance footage did not "establish that [plaintiff] can perform the functions of his job as a tax director" which "required a high cognitive ability, including critical thinking, decision-making, complex problem solving, processing information, evaluating information to determine compliance with standards, and high levels of concentration."); *Pfluger v. U.S. Grp. Long-Term Disability Ins. Plan*, 2007 U.S. Dist. LEXIS 3161, at *45 (E.D. Wis. Jan. 16, 2007) ("Pfluger… claimed disability based upon the frequency and length of the fatigue that she experienced as well as corresponding cognitive and physical impairments. In this case, the surveillance reports recorded a snapshot of unremarkable physical activity; they did not capture information that belies Pfluger's reported fatigue or impairments.").

### C.  Unum Should Be Ordered to Approve and Pay Mr. Shimomura's Claim.

ERISA imposes on plan fiduciaries the responsibility to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" "for the exclusive purpose of" "providing benefits..." ERISA § 404, 29 U.S.C. § 1104. In *Metropolitan Life Ins. Co v. Glenn,* 554 U.S. 105, 115 (2008), the Supreme Court explained:

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets
> forth a special standard of care upon a plan administrator… that the administrator
> "discharge [its] duties" in respect to discretionary claims processing "solely in the
> interests of the participants and beneficiaries" of the plan, [29 U.S.C.]
> §1104(a)(1). *Id.*

Unum breached its fiduciary duty to Mr. Shimomura by ignoring and misstating the medical record, ignoring the cumulative effect of two TBIs/concussions, pointing to irrelevant facts to support denial, citing the absence of tests and assessments that were irrelevant to the issue of disability and utterly failing to analyze Dr. Lewis's three Responses (and repeating erroneous assertions from Unum's prior file reviews that Dr. Lewis had refuted). Unum made

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212

arbitrary claims of prejudice that ignored the nature of PCS, the medical record and Mr. Shimomura's occupational duties as CEO.

Mr. Shimomura has proved based upon the record that he has been disabled from his regular occupation as CEO from August 9, 2016 through the close of the record in the fall of 2019, when Dr. Lewis confirmed that "as a result of the repeated TBI in the 2016 accident," he had been disabled by persistent PCS and "has achieved no significant or lasting improvement since" the accident. R. 1089 (September 2019 Response). Accordingly, Unum should be ordered to approve and pay Mr. Shimomura's claim through the date of judgment.

### III.    CONCLUSION

For the foregoing reasons, Mr. Shimomura respectfully asks this Court to grant his Motion for Judgment pursuant to Fed. R. Civ. Pro. 52(a).

Dated: November 21, 2022

Respectfully submitted,

s/ Megan E. Glor
Megan E. Glor, OSB #930178

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212