IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TSUTOMU SHIMOMURA,

                Plaintiff,

      v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,

                Defendant.

Case No. 3:22-cv-00455-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Tsutomu Shimomura ("Plaintiff") filed this action under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, challenging

Defendant Unum Life Insurance Company of America's ("Defendant") decision, as the claim

administrator of his employer-sponsored benefit plan (the "Plan"), to deny his claim for long-

term disability ("LTD") benefits. Before the Court are Defendant's motion for judgment and

Plaintiff's corrected motion for judgment pursuant to Federal Rule of Civil Procedure ("Rule")

52(a).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C.

§ 1132(e)(1), but not all parties have consented to the jurisdiction of a magistrate judge pursuant

PAGE 1 – FINDINGS AND RECOMMENDATION

to 28 U.S.C. § 636. For the reasons explained below, the Court recommends that the district

judge deny Defendant's motion for judgment and grant Plaintiff's corrected motion for

judgment.

## STANDARD OF REVIEW

"De novo review applies to the denial of benefits under an ERISA-governed insurance

policy where . . . the policy does not assign the administrator discretionary authority to determine

eligibility of benefits or to construe the plan's terms." *Wolf v. Life Ins. Co. of N. Am.*, 46 F.4th

979, 984 (9th Cir. 2022) (citing *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124-25 (9th Cir.

2002)). "Where the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan, [the court] ordinarily

review[s] the plan administrator's decisions for an abuse of discretion." *Wit v. United Behav.*

*Health*, 58 F.4th 1080, 1096 (9th Cir. 2023) (quoting *Schikore v. BankAmerica Supplemental*

*Ret. Plan*, 269 F.3d 956, 960 (9th Cir. 2001)).

The parties move for judgment on the administrative record and stipulate that de novo

review applies.[1] (*See* Pl.'s Corrected Mot. J. ("Pl.'s Mot.") at 1-3, ECF No. 19; Def.'s Mot. J. R.

("Def.'s Mot.") at 1, 34, ECF No. 17.) Consistent with the parties' stipulation, the Court reviews

Defendant's benefits determination de novo. *See Padfield*, 290 F.3d at 1125 (noting that it was

"undisputed that the plan at issue . . . d[id] not give the administrator [discretionary authority],"

and therefore "review[ing] the administrator's determination de novo"); *see also Veronica L. v.*

*Metro. Life Ins. Co.*, No. 21-01260-HZ, --- F. Supp. 3d ---- , 2022 WL 18062830, at *1 (D. Or.

Dec. 28, 2022) (explaining that "courts may accept parties' stipulation to de novo review" and

---

[1] The parties submitted a stipulated record for judicial review. (*See* Stipulated Admin. R.
Jud. Rev. ("Admin. R.") at 1-2, ECF No. 15; *id.* Ex. A at 1-1131, attaching the 1,131-page record
at ECF Nos. 15-1 to 15-12). The Court cites the "Exhibit A" page numbers at the bottom center
of each page.

accepting such a stipulation (citing *Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009))).

When applying the de novo standard and reviewing a Rule 52(a) motion, a court "conducts what is essentially 'a bench trial on the record' using the material considered by the plan administrator." *Veronica L.*, 2022 WL 18062830, at *5 (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). In so doing, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has [met his burden of proving by a preponderance of the evidence] that he . . . is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010); *see also Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016) (explaining that on de novo review, "[t]he claimant has the burden of proving by a preponderance of the evidence that he was disabled under the terms of the plan" (citing *Muniz,* 623 F.3d at 1294)).

In determining whether the claimant was disabled under the terms of the plan, a court "makes factual findings, evaluates credibility, and weighs evidence." *Veronica L.*, 2022 WL 18062830, at *5 (citing *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012) and *Kearney,* 175 F.3d at 1095). "[D]etermining how to weigh evidence and resolve conflicts are within the province of the court when it sits as fact finder." *Sammons v. Regence Bluecross BlueShield of Or.*, 739 F. App'x 385, 386-87 (9th Cir. 2018) (citing *Kearney,* 175 F.3d at 1095 and *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731 (9th Cir. 2006)).

Although a court can make factual findings, evaluate credibility, and weigh evidence on de novo review, the Ninth Circuit has emphasized that a "court's task is to determine whether the plan administrator's decision is supported by the record, not to engage in a new determination of whether the claimant is disabled." *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180,

1182 (9th Cir. 2022). Consequently, a "court must examine only the rationales the plan

administrator relied on in denying benefits and cannot adopt new rationales that the claimant had

no opportunity to respond to during the administrative process." *Id. Collier* is instructive on this

point.

In *Collier*, the administrator sent the claimant's medical records to "an outside [medical]

reviewer," who reviewed the records but did not examine the claimant. *Id.* at 1183. The

administrator also arranged for an independent medical examiner to review the record and

examine the claimant. *Id.* at 1183-84. The Ninth Circuit held that the district court "erred in

adopting new rationales to uphold the denial of [the claimant's] claim for LTD benefits[.]" *Id.* at

1189. In so holding, the Ninth Circuit clarified existing law and addressed what is and is not part

of a court's de novo review:

> [The administrator] did not cite [the claimant's] lack of credibility or the lack of
> objective evidence when it denied her claim initially and on review. . . . In its
> initial denial letter, [the administrator] informed [the claimant] that she did 'not
> meet the definition of disability' under the Plan and that it was therefore denying
> benefits. [The administrator] reiterated this reasoning in its denial letter of her
> internal appeal. In both letters, [the administrator] did not specify that it found
> [the claimant] not credible, that she failed to present objective medical evidence,
> or that such evidence was required under the Plan. Indeed, it omitted portions of
> both [the outside medical reviewer's] and [independent medical examiner's]
> reports where they questioned [the claimant's] credibility in her pain symptom
> reporting in its final denial letter. . . . It was not until [the claimant] initiated
> litigation that [the administrator] argued she was not credible and that she failed
> to present objective evidence in support of her claim.
>
> . . . .
>
> Although we have held that a plan administrator may not hold in reserve a
> new rationale to present in litigation, we have not clarified whether the district
> court clearly errs by adopting a newly presented rationale when applying de novo
> review. We do so now. When a district court conducts a de novo review of a
> benefits denial, it evaluates the plan administrator's reasons for denying benefits
> without giving deference to its conclusions or opinions. . . . Thus, had [the
> administrator] cited [the claimant's] lack of credibility as a reason for denying
> benefits in the administrative process, the district court would have been within its
> province to review the administrative record and determine whether the evidence

supported that decision. . . . But a district court cannot adopt post-hoc rationalizations that were not presented to the claimant, including credibility-based rationalizations, during the administrative process.

. . . [C]redibility determinations are *not* inherently part of the de novo review. . . . If the denial was not based on the claimant's credibility, the district court has no reason to make a credibility determination. Thus, when review is de novo and credibility is not at issue, the district court should weigh the record evidence and any evidence admitted by the court to determine whether the plan administrator properly denied benefits. . . . The court must refrain from fashioning entirely new rationales to support the administrator's decision. Such an approach would evade ERISA's protections for the same reasons a plan administrator undermines ERISA's protections when asserting new arguments for the first time in litigation.

*Id.* at 1187-88 (citations omitted).

## BACKGROUND

### I.    THE PARTIES

Plaintiff is a physicist and computer programmer who was born in October 1964, graduated from the California Institute of Technology, and founded Neofocal Systems, Inc. ("Neofocal"), a fabless semiconductor company. (Admin. R. Ex. A at 47, 127-28.) At all relevant times, Plaintiff served as Neofocal's Chief Executive Officer ("CEO"). (*Id.* at 47, 482-83, 508-510.) As a Neofocal employee, Plaintiff was eligible for LTD benefits under the Plan, effective as of August 1, 2016, and which Defendant administered and insured. (*Id.* at 76-118, 962-68, 1107-16.)

### II.    THE PLAN

The Plan provided, in relevant part, that a claimant is disabled "when [Defendant] determines that . . . [he is] *limited* from performing the *material and substantial duties* of [his] *regular occupation* due to [his] *sickness* or *injury*." (*Id.* at 90) (emphasis altered). The Plan defined "regular occupation" as the job the claimant was "routinely performing when [his] disability begins," and provided that Defendant "will look at [the] occupation as it is normally

performed in the national economy," not "how the work tasks are performed for a specific
employer or at a specific location." (*Id.* at 108) (all caps and bold omitted). The Plan defined
"limited" as "what [the claimant] cannot or [is] unable to do," and "material and substantial
duties" as "duties that . . . are normally required for the performance of [the claimant's] regular
occupation . . . [and] cannot be reasonably omitted or modified." (*Id.* at 106-07) (all caps and
bold omitted). The Plan defined "sickness" as "an illness or disease" and "injury" as "a bodily
injury that is the direct result of an accident and not related to any other cause," and added that
"[d]isability must begin while [the claimant is] covered under the [P]lan." (*Id.* at 108) (all caps
and bold omitted).

The Plan also included provisions regarding, among other things, when a claimant must
file proof in support of his LTD claim. (*Id.* at 80.) Specifically, the Plan provided, in relevant
part, that a claimant "must send [Defendant] proof of [his LTD] claim no later than one year after
the date [his] disability begins unless [his] failure to do so is due to [his] lack of legal capacity."
(*Id.*)

## III.    THE ADMINISTRATIVE PROCESS

On September 14, 2018, Plaintiff's former counsel sent Defendant a letter stating that
Plaintiff was initiating the claim process and attaching related forms, including Plaintiff's
employee/individual statement and Neofocal's employer statement. (*Id.* at 36-53; *see also id.* at
2, demonstrating that Defendant's files listed "09/14/2018" as the day it received notice of
Plaintiff's claim). Plaintiff's counsel added that she would be forwarding an attending physician
form from Plaintiff's long-time psychiatrist, Thomas Lewis, M.D. ("Dr. Lewis"), an assistant
clinical professor in the Department of Psychiatry at the University of California, San Francisco
School of Medicine and a diplomate of the American Board of Psychiatry and Neurology. (*Id.* at
37, 771; *see also id.* at 80, noting what a claimant must file as proof of claim and that the

claimant, the claimant's employer, and the claimant's "attending physician" must complete their own claim forms).

In his employee/individual statement, Plaintiff represented that he was alleging disability based on an injury that occurred on August 9, 2016, the day he was rear-ended in Portland, Oregon, and suffered a "[c]losed-head injury." (*Id.* at 41, 294-97, 1084.) Plaintiff represented that as a result of his injury, he was experiencing "[p]ersistent cognitive impairment, disrupted sleep, and neuropathic pain" and not able to perform "[e]ffective attention and memory, decision[-]making, [and] interaction with colleagues and business associates." (*Id.* at 41-42.) Plaintiff also noted that he previously suffered a closed-head injury in an August 2006 accident at Home Depot, Dr. Lewis treated both of his closed-head injuries, and he was currently working in a "very limited" capacity. (*Id.* at 41-42; *see also id.* 154, 1084, discussing the Home Depot accident).

In its employer statement, Neofocal's controller, Richard Katamura, represented that Plaintiff was currently working daily in a "very limited" capacity as Neofocal's CEO, Plaintiff's primary duties consisted of "confer[ring] with [his] assistant regarding [the] status of [the] company," Plaintiff took a medical leave of absence from September 7, 2016 through December 20, 2016, Plaintiff worked in a limited capacity from December 20, 2016 through May 23, 2017, and Plaintiff was on medical disability leave from May 24, 2017 through August 21, 2017. (*Id.* at 47-49.)

On September 19, 2018, Plaintiff's counsel forwarded Dr. Lewis's attending physician statement to Defendant. (*Id.* at 62-65.) In his attending physician statement, Dr. Lewis explained that his medical specialty is psychiatry, Plaintiff's primary diagnosis was a traumatic brain injury ("TBI") "suffered in [an August 9,] 2016 automobile collision," the International Classification

of Diseases ("ICD") code for Plaintiff's primary diagnosis was "F07.81—postconcussional syndrome," and Plaintiff suffers from "continuing" physical and behavioral health "restrictions and/or limitations," including "significant cognitive deficits, impaired memory, sleep disruption, and impaired executive neurological functions." (*Id.* at 63-65) (all caps and bold omitted). Dr. Lewis further explained that Plaintiff's physical and behavioral health restrictions and/or limitations impair his ability to "undertake and complete significant multivariate technical analyses in his profession" and "interact effectively with colleagues, business associates, and others, especially in situations requiring close to sustained attention or focus," and that he previously treated Plaintiff for "the same/similar condition." (*Id.* at 63-64.) With respect to Plaintiff's treatment plan, Dr. Lewis explained that "[t]here is no 'cure' for TBI" and that a patient's "symptoms are [only] managed through medications, rest (especially adequate sleep), and avoidance of physical or situational stresses that exacerbate symptoms and dysfunction." (*Id.* at 64.) Dr. Lewis also explained that his opinions were based on "[m]ultiple clinical examinations, responses of symptoms to trials of various medications [and] review of [imaging] studies." (*Id.*)

On November 6, 2018, Defendant sent Plaintiff a letter regarding the status of his claim and asked for "additional information so [that it could] continue [its] evaluation of [Plaintiff's] claim[.]" (*Id.* at 138-41.) On November 26, 2018, Plaintiff's counsel sent Defendant a letter responding to its request for additional information (*id.* at 151-53) and provided Defendant with 115 pages of records from Dr. Lewis (*id.* at 154-268), Plaintiff's payroll records (*id.* at 269-76), an authorization to collect and disclose information (*id.* at 277-78), Plaintiff's August 9, 2016 hospital records (*id.* at 279-93), and the traffic accident and insurance report that Plaintiff submitted to the Oregon Department of Motor Vehicles on or about August 12, 2016. (*Id.* at 294-

97; *see also id.* at 827, confirming Dr. Lewis's submission of his complete set of records for "2006 to [February 2019], i.e., for the entire thirteen years since Dr. Lewis began treating [Plaintiff]").

In a letter dated December 5, 2018, Defendant informed Plaintiff that it would be "extending the time in which [it would] be making a decision on [his LTD] claim" because it was in the process of obtaining additional "necessary information" from Neofocal. (*Id.* at 319-23.) Defendant also noted that the "effective da[t]e of coverage" was August 1, 2016, Plaintiff's "disability date" was August 9, 2016, Defendant "should have received [Plaintiff's claim] prior to November 7, 2016 . . . [but] did not receive [his] completed claim forms until September 14, 2018," Plaintiff's "late submission of [his] claim may impact [Defendant's] ability to reach a determination with regard to liability," Defendant "may have difficulty certifying a continuous disability throughout the claimed time period" because of "the delay," and the delay "also prevented [Defendant] from conducting a timely investigation, which might have included an independent medical examination, vocational or rehabilitation assistance if applicable." (*Id.* at 319-20.)

On March 4, 2019, a few days after Defendant informed Plaintiff that it would begin its review of his claim (*see id.* at 852-54), Defendant's on-site physician, Maribelle Kim, M.D. ("Dr. Kim"), sent a letter to Dr. Lewis in an attempt to "gain a better understanding of [his] medical opinion and discuss questions [she had] regarding [her] interpretation of the available medical data." (*Id.* at 858-59.) Dr. Kim observed that Plaintiff alleged that he was disabled as of August 9, 2016 "due to post-concussion syndrome/[TBI] . . . after a motor vehicle accident" on that same date, but explained that given the "currently available records and . . . that [it was] a late file, it [was] unclear whether [Plaintiff] was/is precluded from [August 9, 2016] forward

from performing his noted occupational duties . . . full-time." (*Id.* at 857.) Dr. Kim emphasized, among other things, that (1) Plaintiff's medical records did not include "any diagnostic imaging of the brain since his date of disability" or referrals for "cognitive rehabilitation" or to "specialists such as neurology for further evaluation of his cognitive difficulty," (2) a December 2012 magnetic resonance imaging ("MRI") of Plaintiff's brain noted "persistent clinical sequelae of TBI following left posterior head impact [in] 2006" and "localized cortical volume loss, consistent with sequelae of prior posterior head injury," and (3) Plaintiff's medical records demonstrated that he was "evaluated/treated regularly by [Dr. Lewis] since at least [January 8, 2007] due to status post TBI in 2006 with subsequent mood destabilization, poor sleep and a number of cognitive deficits, including difficulty with attention and executive function." (*Id.* at 857-58.)

Based on these observations, Dr. Kim asked Dr. Lewis to explain whether, in his opinion, the available medical evidence and his examinations supported the conclusion that Plaintiff was "precluded at any time from [August 9, 2016] forward from performing full-time work activities," including the "[m]ental demands" of "directing, controlling or planning activities of others; influencing people in their opinions, attitudes and judgments; making judgments and decisions; dealing with people; performing a variety of duties; sustained concentration and attention; . . . mak[ing] simple work-related decisions[]; understanding and memory for both short and detailed instructions; independent planning; [and] public and peer interaction." (*Id.* at 858.) Relatedly, Dr. Kim asked Dr. Lewis to discuss the basis of his opinions and Plaintiff's prognosis. (*Id.*)

In a response letter dated March 25, 2019, Dr. Lewis provided answers to Dr. Kim's questions. (*Id.* at 888-91.) With respect to Plaintiff's ability to perform the aforementioned

mental demands, Dr. Lewis explained that in his opinion, Plaintiff "was (and continues to be) completely unable to perform adequately the functions of [his] job [as CEO of a technology start-up company], which include[d] the activities [Dr. Kim] mention[ed] . . . [in her letter]." (*Id.* at 888-89.) Dr. Lewis explained that his opinion regarding Plaintiff's inability to perform those duties was due to "the decrements in his executive function capacity and his stress response capacity produced by the TBI he suffered in the motor vehicle accident in [August] 2016." (*Id.* at 889.) Dr. Lewis added that post-accident, Plaintiff reported the "new development" of several issues, such as sleeping difficulties, difficulty "regulating his emotional response to stress," making "frequent errors in many activities, both complex and simple," an "[i]nability to regulate his attention and focus," greater "difficulty with problem solving," and "[m]arked cognitive slowing, where a given task at work could take him ten times longer to complete than it had prior to the accident." (*Id.*)

With respect to the rationale underlying his opinion, Dr. Lewis focused first on the pathophysiology of minimal TBI ("mTBI") and persistent post-concussive syndrome. (*Id.*) Dr. Lewis explained that when a person's "head moves suddenly (as may happen in an acceleration-deceleration event of the sort produced by the collision of motor vehicles), [it] causes a sudden, sharp rotational movement of the brain inside the skull," which "exerts force on the long axonal fibers that course throughout the brain." (*Id.*) Dr. Lewis also explained that two of the areas most prone to injury (the medial temporal lobe and prefrontal cortex, respectively) impact "memory function" and "regulation of emotional responses," and "cognitive speed and agility." (*Id.*) Dr. Lewis further explained that intact structure and function of long axonal fiber is referred to as "white matter integrity," and as white matter integrity declines, cognitive speeds drop and patients increasingly describe cognitive activities as "foggy, difficult, and effortful,"

"frequently report significantly reduced cognitive stamina," and "evidence difficulty with executive function," i.e., the "ability to control attention, ability to inhibit impulses, working memory, cognitive flexibility, prioritization, planning and problem solving." (*Id.* at 889-90.) Dr. Lewis added that "abnormalities of brain function produced by decrements in white matter integrity are not usually detectable by" computed tomography ("CT") scans and MRI, nor are such abnormalities "usually detectable by neurological examinations." (*Id.* at 890.)

Based on these observations, Dr. Lewis explained that in his opinion, Plaintiff continues to suffer from a persistent post-concussive syndrome "produced by the motor vehicle accident." (*Id.*) Dr. Lewis emphasized that persistent post-concussive syndrome is "a clinical [diagnosis]," and "not made by findings from neurological exam, CT scanning, or MR[Is,]" as "none of these measures reliably assess the presence or absence of abnormal brain functioning induced by mTBI events." (*Id.*) Dr. Lewis also emphasized that cognitive testing "would not be clinically illuminating," the in-office test Dr. Kim mentioned (a mini-mental status exam or "MMSE") "does not assess executive function," and formal neurocognitive testing would not be useful because although it may reveal whether Plaintiff's "executive function has been adversely affected to the point where it is below the normal range . . . , [it would not reveal] whether he has had a *decrement* in executive function that might impair him from performing a highly demanding job, like being a CEO." (*Id.*)

To conclude, Dr. Lewis explained that when, as here, "useful and informative objective medical tests are lacking," a patient's "diagnosis is established by reference to the question: what is the clinical syndrome most consistent with the history of the illness and its signs and symptoms?" (*Id.* at 891.) In Dr. Lewis's opinion, the "diagnosis most consistent with the known facts is persistent post-concussive syndrome." (*Id.*) Recognizing that a medical provider must

pay "careful attention . . . to the possibility that an individual patient may exaggerate or over report symptoms and/or symptom severity" in "any clinical situation in which symptoms are largely reported subjectively," Dr. Lewis stated that he could "find no evidence of such over-reporting or exaggeration" in Plaintiff's case, noting that it appeared to him that Plaintiff "has (unsuccessfully) tried to work" as Neofocal's CEO and "derives enormous life satisfaction" from working. (*Id.*)

The next day, March 26, 2019, Defendant sent Plaintiff a letter "approving [his] request for [LTD] benefits under reservation of rights" and "while [Defendant] complete[d] [its] review." (*Id.* at 912-16, 918.) Defendant explained that it would issue monthly payments under a reservation of rights because Plaintiff's "claim was filed late," and that it "retain[ed] all rights, including the right to seek the return of any benefit that was not payable under the policy." (*Id.* at 913.)

On April 4, 2019, Defendant's designated medical officer, Stephen Selkirk, M.D. ("Dr. Selkirk"), who is board certified in neurology and a Diplomate of the American Board of Psychiatry and Neurology, completed his review of Plaintiff's records, and issued a response. (*Id.* at 947-48.) Dr. Selkirk explained that he "[c]oncur[red]" with the opinion of Defendant's on-site physician, Dr. Kim, who, according to Dr. Selkirk, "opined that there was no evidence to support that [Plaintiff] was precluded from work at a sustained full-time level from [August 9, 2016] forward." (*Id.* at 947; *but cf. id.* at 902-04, March 26, 2019, Dr. Kim reported that she was "[u]ncertain" as to whether Plaintiff "was/is precluded from [August 9, 2016] forward from performing his . . . occupational duties full-time"). Dr. Selkirk explained that he also performed his "own independent analysis and formed [his] own conclusions." (*Id.* at 947.) Specifically, Dr. Selkirk concluded that Plaintiff did "not have any significant abnormalities on neurological

examination to warrant restrictions or limitations," Dr. Lewis "failed to document any
neurological deficit, including abnormal cognitive function, at [multiple] encounters," the
severity and frequency of Plaintiff's "reported sleep dysfunction and headaches [were] not
corroborated by clinical data in the medical record," the clinical data did "not support the
presence of ongoing cognitive dysfunction," and Plaintiff's "reported symptoms of cognitive
impairment [were] out of proportion to the reported [August 9, 2016] incident and injury." (*Id.* at
947-48.)

On April 24, 2019, Defendant sent Plaintiff a letter informing him that it had completed
its review of his LTD claim and determined that "no further [LTD] benefits [were] payable." (*Id.*
at 962-68.) In the portion of the letter addressing its decision, Defendant explained that
Plaintiff's "late filing of his claim ha[d] prejudiced [Defendant] from evaluating his disability
and the medical evidence provided [did] not provide support for disability." (*Id.* at 963.) In the
portion of the letter discussing information that supported its decision, Defendant summarized
conclusions and findings from Dr. Lewis's March 25, 2019 letter, Dr. Kim's March 26, 2019
opinion, and Dr. Selkirk's April 4, 2019 opinion. (*Id.* at 964-65.) Defendant concluded that
Plaintiff's claim file did "not support disability and had his claim been filed timely [Defendant]
would have likely conducted a Neuropsychological Independent Medical Evaluation." (*Id.* at
965.)

On May 7, 2019, Plaintiff informed Defendant that he intended to appeal its decision and
requested a complete copy of its claim file and other relevant documents and information. (*Id.* at
980-81.) Plaintiff also outlined the basis for his disagreement. (*Id.* at 980.) Plaintiff noted that
Dr. Lewis explained why Dr. Kim's concerns about the absence of any neuropsychological
testing in or around the date of the accident were unfounded, Defendant's initial payment

suggested that Dr. Lewis "answered, apparently to [Defendant's] satisfaction," any issues raised

in Dr. Kim's opinion with respect to prejudice and post-accident disability, Dr. Lewis "explained

in some detail" why the medical evidence supports Plaintiff's LTD claim, and Defendant failed

adequately to explain why it was "now tak[ing] issue with Dr. Lewis'[s] assessment, beyond the

questions previously raised by Dr. Kim and answered by Dr. Lewis." (*Id.* at 980-81.) Plaintiff

also advised that Dr. Lewis would be responding more fully to Defendant's stated concerns. (*Id.*

at 981.)

On July 11, 2019, Plaintiff sent Defendant a fifteen-page letter from Dr. Lewis dated June

24, 2019, and requested that Defendant proceed with its consideration of his appeal. (*Id.* at 1017-

18.) Plaintiff asserted that Defendant appeared to "reverse[] itself and terminate[] payment solely

on the basis of Dr. Selkirk's [April 4, 2019 opinion,] . . . [as this] was the only additional

information obtained by [Defendant] before it terminated payment of the claim." (*Id.* at 1017.)

Plaintiff added that Defendant should consider interviewing him and "having [him] evaluated in

person by an independent medical professional whose independence is beyond reasonable

concern." (*Id.*)

In his follow-up letter, Dr. Lewis noted that he previously responded to Dr. Kim's

questions and provided the medical rationale for his opinions, and explained that Dr. Selkirk's

opinion was "misleading in a number of respects" and "mistaken assumptions . . . appear[ed] to

underlie [Dr. Selkirk's] conclusions." (*Id.* at 1019-33.) Dr. Lewis emphasized that motor vehicle

collisions or "abrupt acceleration and/or deceleration" can "easily transmit sufficient kinetic

energy to the brain" to cause mTBI, and contrary to Dr. Selkirk's suggestion, "it is not necessary

for the head to collide with a physical object in order to produce mTBI," a term "typically

considered synonymous with 'concussion[,]'" because "when the head moves suddenly, the

brain [surrounded by fluid] rotates within the skull and . . . deforms and twists internally." (*Id.* at 1020-21.)

Dr. Lewis also explained that although a "majority of patients who undergo mTBI recover uneventfully[,] . . . a minority of mTBI patients develop persistent symptoms after the event." (*Id.* at 1022.) Dr. Lewis noted that the term persistent post-concussive syndrome or "PPCS" is used to describe such "long-lasting symptoms and deficits." (*Id.*) Quoting relevant medical literature, including the Ontario Neurotrauma Foundation Guidelines, Dr. Lewis added that (1) PPCS is quite common, as the "[f]unctional outcomes after mTBI are extremely diverse" and even in cases where patients experience "similar injuries, approximately . . . 30% [of mTBI patients] will suffer long-term symptoms and impairment, which [can] vary from mild and annoying to . . . disabling," and (2) "[t]he literature would suggest that minimally 15% of persons with concussion may experience persisting symptoms beyond the typical 3 month time frame." (*Id.* at 1023.)

Dr. Lewis proceeded to describe the circumstances of Plaintiff's accident (i.e., he was rear-ended while stopped in traffic and the impact knocked his sunglasses off his head and pushed his vehicle "several meters" forward into another vehicle), Plaintiff's subsequent reports of "new development" of "some of the most common symptoms seen in patients with PPCS," and the consistency between Plaintiff's "brain injury and the subsequent symptomatic aftermath" and the "known pathophysiology of mTBI and . . . clinical outcomes of patients who are unfortunate enough to have persistent post-injury symptoms." (*Id.* at 1024-25.) Thereafter, Dr. Lewis provided an evaluation of Dr. Selkirk's opinion, which, in his view, "reveal[e]d that [Dr. Selkirk was] either deeply unfamiliar with clinical practice in the area of mTBI or deeply

unfamiliar with the medical literature on mTBI (including treatment guidelines), or perhaps both." (*Id.* at 1024-25.)

Dr. Lewis's evaluation of Dr. Selkirk's opinion focused on, and provided rebuttals to, Dr. Selkirk's statements about cognitive testing, CT scans and MRIs, loss of consciousness and visible head trauma, headaches, and sleep. (*Id.* at 1026-32.) Notably, Dr. Lewis stated that Dr. Selkirk's opinion appeared to rest on the false "foundational assumption that cognitive testing in mTBI is clinically desirable, informative, and constitutes part of the routine care for such patients." (*Id.* at 1026.) Dr. Lewis explained that "[t]here is simply no convincing evidence that cognitive or neuropsychological testing is clinically useful in this cohort of patients, or that such testing improves patient outcomes." (*Id.*) After noting that the United States military has "perhaps the most experience with mTBI patients . . . because of the great number of soldiers who have suffered blast-related concussions in recent wars," Dr. Lewis quoted supporting authority from the Departments of Defense and Veterans Affairs clinical practice guidelines (the "VA/DoD guidelines") on the management mTBI patients, which reflect that the thirty-eight medical professionals who drafted the guidelines found "no evidence of [the] utility in cognitive testing in mTBI management [and in fact] strongly advise[d] *against* obtaining such testing[.]" (*Id.*)

Consistent with the VA/DoD guidelines, Dr. Lewis explained that his evaluation of mTBI patients is focused on their personal and clinical history and whether there has been a decrement in their cognitive status or executive function from their personal baselines, and that he cannot derive such information from cognitive testing that addresses only how a patient currently performs "against a demographically matched group of people who have not sustained brain injury" or neurocognitive testing that addresses whether the patient's "executive function has

been adversely affected to the point where it is below the normal range with respect to his age group." (*Id.* at 1027.) In support of his approach, Dr. Lewis noted that the VA/DoD guidelines likewise provide that "[t]he diagnosis of mTBI is a clinical diagnosis, relying predominately on patient history." (*Id.*) Dr. Lewis added that his records "contain exquisitely detailed information about the nature and progression of the cognitive deficits [Plaintiff] experienced," including the records from "[e]very encounter" that Dr. Selkirk cited in his conflicting opinion. (*Id.* at 1026-27.)

Dr. Lewis also noted that CT scans and MRIs "usually fail to detect evidence of structured brain abnormalities in mTBI." (*Id.*) Dr. Lewis added that "[d]iffuse (or multifocal) axonal injury is a process that occurs at the cellular and axonal level, a microscopic scale not visualized by the current resolution capacities of CT or MRI," and the "profusion of inflammatory mediators in the brain that can follow mTBI occurs on spatial scale that is well below the cellular [level]." (*Id.*) Dr. Lewis explained that medical professionals "know this to be true," in part because of "autopsies, which involve microscopic dissection and examination of brain tissues, have demonstrated that widespread neuronal death . . . has been found [in patients who suffered from TBI and persistent symptoms but died of other causes], despite normal imaging findings[.]" (*Id.* at 1029.) Dr. Lewis stated the VA/DoD guidelines "suggest against" using neuroimaging to establish the diagnosis of mTBI or direct the care of patients with a history of mTBI, and provide that the evidence does not support that there is any "confirmatory objective test" that can be used for purposes of direct treatment or predicting outcomes in mTBI patients. (*Id.*)

To extent Dr. Selkirk relied on the fact that Plaintiff's "reported injury did not result in loss of consciousness," Dr. Lewis emphasized that loss of consciousness is "not required for

diagnosis of concussion/mTBI," and "[p]atients can and do undergo mTBI events that do not result in [loss of consciousness] but nevertheless produce brain dysfunction and lasting symptoms." (*Id.*) To the extent Dr. Selkirk relied on the absence of visible head trauma, Dr. Lewis stated that such reliance was "lacking in medical substance to a degree that [he found] startling," as "patients can be concussed by the force imparted to the brain by sudden acceleration/deceleration," a "body blow to the chest," or "being in the *vicinity* of an explosion." (*Id.* at 1030.)

    With respect to Dr. Selkirk's statement that the clinical data did not corroborate the severity and frequency of Plaintiff's headaches, Dr. Lewis explained that he had "no idea as to why this information can be [considered] relevant to a determination of [Plaintiff's] disability status," as he has "never contended that [Plaintiff was] disabled from performing his occupation on the basis of headache severity[.]" (*Id.* at 1030.) Finally, with respect to Dr. Selkirk's statement that the clinical data did not corroborate the severity and frequency of Plaintiff's reported sleep dysfunction and there was no "formal diagnosis of a sleep disorder based on diagnostic testing," Dr. Lewis explained that Dr. Selkirk's statement rested on a "foundational assumption" that was "quite demonstrably false," namely, that "diagnostic testing (i.e., a sleep study such as an overnight polysomnogram) in a necessary prerequisite for the diagnosis of every sleep disorder, or even most sleep disorders, or even the specific sleep disorder that [Plaintiff] actually has [i.e., insomnia]." (*Id.* at 1031.) Relatedly, Dr. Lewis observed that the American Academy of Sleep Medicine's ("AASM") practice parameters reflect that insomnia is "primarily diagnosed clinically with a detailed medical, psychiatric, and sleep history," and provide that "polysomnography is not indicated for the routine evaluation of transient insomnia, chronic insomnia, or insomnia associated with psychiatric disorders." (*Id.* at 1030-31.)

On July 24, 2019, Defendant's medical consultant, Jacqueline Crawford, M.D. ("Dr. Crawford"), who is board certified in neurology and neuromuscular and electrodiagnostic medicine, reviewed Plaintiff's medical file and Dr. Lewis's opinions as part of Plaintiff's appeal. (*Id.* at 1044-49.) Dr. Crawford concluded that the medical evidence of record was not sufficient to determine whether Plaintiff could perform the physical and mental demands of his regular occupation as of or "beyond" August 2016. (*Id.* at 1047.) Responding to the questions Defendant posed, Dr. Crawford noted that if Plaintiff had timely filed his claim, "multiple actions would have been taken to determine [Plaintiff's] work capacity," such as a "[c]ontemporaneous telephone and/or personal interview of [Plaintiff]," a "[c]ontemporaneous . . . telephone call" with Dr. Lewis, the "[a]cquisition of all contemporaneous medical records from primary sources," conducting a "[t]imely neurological or neuropsychological [independent medical examination]," and "[p]ossible surveillance of the insured." (*Id.*) Dr. Crawford added that a current independent medical examination ("IME") "would not be time-relevant to [August 9, 2016 to December 10, 2016]" because "[t]he natural history of mTBI is for maximal symptoms in the hours and days after injury with gradual improvements over weeks to months, with the grand majority of individuals resolving to baseline within three months," and thus "an evaluation nearly three years after the index event would not reflect the insured's status as of [this time period]." (*Id.*)

Dr. Crawford observed that "[w]hile not offered as proof of [the] absence of symptoms, the file does not contain evidence the [emergency room] providers were sufficiently concerned about possible brain injury based upon their clinical evaluation to order a CT [scan of the] brain." (*Id.* at 1048.) Dr. Crawford proceeded to acknowledge that "MRI[s] of the brain in persons reporting symptoms of post-concussion syndrome are often normal," and stated that

when "an individual [is] reporting symptoms which rise to the level of impairment beyond a few weeks, referral for MRI or neurological evaluation to rule out structural causes such as delayed cerebral edema, ischemia, hydrocephalus, or subdural hematoma would be anticipated" and "[n]o such referral is found in the file after [Plaintiff's accident]." (*Id.*) Dr. Crawford also emphasized that the "file does not include evidence of [a] systematic search for alternative explanations of reported impairing symptoms by referral for laboratory studies, sleep studies, or concussion clinic as would be anticipated if [the] symptoms rose to the level of impairment." (*Id.*) Dr. Crawford concluded by noting that per Dr. Lewis, "headaches are not offered as impairing." (*Id.* at 1049.)

In a letter dated July 25, 2019, Defendant informed Plaintiff it had considered "new information and/or rationale developed on appeal which appear[ed] to support [its] decision," namely, Dr. Crawford's opinion. (*Id.* at 1060.) Defendant explained that before it made a final decision, Plaintiff had "a right to review and respond" to Dr. Crawford's opinion by August 9, 2019. (*Id.*) The parties subsequently agreed to extend Plaintiff's deadline to September 9, 2019. (*Id.* at 1072.)

On September 9, 2019, Plaintiff provided Defendant with Dr. Lewis's response to Dr. Crawford's opinion (*Id.* at 1080-89.) In his letter dated that same day, Dr. Lewis addressed Defendant's "continued insistence that [Plaintiff] is not cognitively impaired from his repeated concussions," and suggestions that Plaintiff is "exaggerating or fabricating his condition" and Defendant's consultants, "who have *never so much as spoken* with [Plaintiff], let alone observed him in person[,] are in a better and more reliable position to assess his medical condition." (*Id.* at 1081-89.)

///

Dr. Lewis explained that Dr. Crawford's "[a]nalysis/[r]ationale" was "literally a set of bullet points" that "rel[ied] on either medically specious reasons, non-sequiturs, and baseless speculation." (*Id.* at 1082.) Dr. Lewis stated that "two things cannot be emphasized highly enough": (1) "the effects of [TBIs], including concussion injuries, are *cumulative*," which means that "a person who suffers a [TBI], even after recovering from that first injury, is left far more vulnerable to suffering new, renewed or worse impairment(s) from any subsequent TBI, even if that second TBI is 'mild,'" and (2) "the professional assessment of TBI and persistent post-concussion syndrome is a fundamentally clinical endeavor," and "cannot be done responsibly without careful personal observation of the patient[.]" (*Id.* at 1082.) With respect to his point about the cumulative effects of Plaintiff's injury, Dr. Lewis noted that "Dr. Crawford's file review appear[ed] to indicate that she was not made aware" of the fact that Plaintiff "suffered a significant TBI in August 2006 when he was struck in the head by a falling pipe [at Home Depot]." (*Id.*)

Focusing his discussion on mTBIs, Dr. Lewis explained that "modern neuroscience research has revealed that much less force is necessary [to product mTBIs] than many have imagined." (*Id.* at 1085-86.) For example, Dr. Lewis cited a neuroscience research group's finding that "repetitively striking one's head against a moving soccer ball (a common activity called 'heading' the ball) exerts enough force on the brain to produce" diffuse axonal injury ("DAI"), a "widespread injury to axons in locations spatially distant from the site of blow." (*Id.* at 1086.)

With respect to Plaintiff's work, Dr. Lewis cited Plaintiff's report that in June 2017, Neofocal's co-founder and "major investor" resigned and "expressed in writing that [Plaintiff's] behavior had changed since his August 2016 car accident, creating an intolerable situation and

the need to sell the company and/or its remaining assets." (*Id.* at 1089.) Dr. Lewis concluded by noting that he has found Plaintiff's "reports of his symptoms to be clinically credible and consistent with the current medical understanding of cumulative TBI and its cognitive effects," it is his "considered opinion as [Plaintiff's] treating physician that [Plaintiff] suffered a second [TBI] in the 2016 auto accident that manifested as persistent post-concussive syndrome with pronounced impairment of his working memory [and] his ability to focus and concentrate, and to interact effectively with others," and it is his "clinical assessment that as a result of the repeated TBI in the 2016 accident, [Plaintiff] became [unable] to perform the cognitive demands required in his occupation, and that [Plaintiff] has achieved no significant or lasting improvement since that time." (*Id.*)

The next day, September 10, 2019, Dr. Crawford issued a one-page addendum addressing Dr. Lewis's response to her initial opinion. (*Id.* at 1097.) In her discussion, which consisted of five bullet points, Dr. Crawford noted that Plaintiff's ability to complete a post-accident incident report was "relevant, as it [demonstrated] the absence of retrograde or anterograde amnesia which can be seen in [TBI cases]," that nobody "independently verified" Plaintiff's "feelings of being scattered while in Hong Kong" post-accident, which she referred to as "a problem [stemming from] late filing," and that Plaintiff "improved and returned to Neofocal" after the 2006 "Home Depot incident." (*Id.*) Dr. Crawford also stated that Dr. Lewis's "concerns for cumulative injury were noted," but given "Dr. Lewis's narrative" about Plaintiff's "extraordinary cognitive capacity," a "high cognitive reserve . . . would be anticipated to serve [Plaintiff] well when considering the cognitive demands described in the [January 24, 2019] occupational addendum." (*Id.*)

///

PAGE 23 – FINDINGS AND RECOMMENDATION

On September 20, 2019, Plaintiff declined the opportunity to have Dr. Lewis respond to Dr. Crawford's addendum and asked Defendant to "make a final decision immediately." (*Id.* at 1103.)

In a letter dated October 1, 2019, Defendant informed Plaintiff that it had "determined [that its initial] decision on [his LTD] claim [was] correct." (*Id.* at 1107-16.) Defendant based its decision on its medical consultants' observations, in particular those related to late filing and prejudice. (*Id.*)

## DISCUSSION

## I.    DEFENDANT'S MOTION

Defendant asserts that there are two reasons why it is entitled to judgment on the record. (Def.'s Mot. at 1.) First, Defendant asserts that it is entitled to judgment on the record pursuant to Oregon's "notice-prejudice rule," because Plaintiff failed timely to give notice of his LTD claim and Defendant suffered prejudice as a result. (*See id.* at 1, 26, referring interchangeably to the "notice-prejudice rule" and "late notice defense"). Second, Defendant asserts that even assuming that it is not entitled to judgment on the record pursuant to Oregon's notice-prejudice rule, Plaintiff failed to meet his burden of demonstrating that he was disabled under the Plan's terms. (*Id.* at 1, 30).

### A.    The Notice-Prejudice Rule

#### 1.    Applicable Law

The parties agree that in evaluating their arguments regarding the notice-prejudice rule, the Court must look to Oregon law. (*See* Pl.'s Mot. at 29, stating that Oregon's notice-prejudice rule was established in an Oregon Supreme Court case and was "effectively" part of the Plan's terms; Def.'s Mot. at 1, 26, asserting that under the Plan's terms, Oregon law "govern[s]" the issue of whether Defendant was "prejudiced by [any] late notice" and the "notice-prejudice rule"

bars Plaintiff's claim). Oregon's "notice-prejudice rule . . . provides that an insurer may not deny coverage due to the insured's failure to give timely notice unless the insurer can show it was prejudiced thereby." *Or. Schs. Activities Ass'n v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 279 F. App'x 494, 495 (9th Cir. 2008) (citing *Lusch v. Aetna Cas. & Sur. Co.*, 538 P.2d 902, 904 (Or. 1975)).

In evaluating whether an insurer was entitled to deny a claim pursuant to the notice-prejudice rule, a court's inquiry is twofold: "(1) whether the insurer was prejudiced by the delayed notice; and (2) if the insurer was prejudiced, whether the insured acted reasonably in failing to give notice at an earlier time." *Emps. Ins. of Wausau v. Tektronix, Inc.*, 156 P.3d 105, 111 (Or. Ct. App. 2007) (citing, *inter alia*, *Carl v. Or. Auto. Ins. Co.*, 918 P.2d 861, 863 (Or. Ct. App. 1996)); *see also Carl*, 918 P.2d at 863 (describing the "two-part inquiry" (citing, *inter alia*, *Lusch*, 538 P.2d at 903-05)). "The insurer has the burden of demonstrating prejudice." *Tektronix*, 156 P.3d at 111 (citing *Halsey v. Fireman's Fund Ins. Co.*, 681 P.2d 168, 170 (Or. Ct. App. 1984)).

### 2.    Analysis

The Court concludes that Defendant has not met its burden of demonstrating prejudice. The Court therefore recommends that the district judge deny Defendant's motion to the extent that it argues it appropriately denied Plaintiff's LTD claim in accordance with the notice-prejudice rule.

There is no dispute that Plaintiff failed timely to give notice of his claim and that Defendant bears the burden of demonstrating prejudice due to the delayed notice.[2] (*See* Def.'s

---

[2] The Court need not address Defendant's argument that it did not waive any "late notice defense" (*see* Def.'s Mot. at 23-24), because Plaintiff does not argue that Defendant waived such a defense. Defendant also suggests that this "case involves a straightforward application of the one-year [proof of claim] deadline," and that "[t]he Court should enforce the [P]lan requirement

Mot. at 1, 25-26; Pl.'s Mot. at 5, 29-30, 32, 35 reflecting that the parties confirmed as much and agree with respect to Plaintiff's disability onset date of August 9, 2016, the August 9, 2017 proof of claim deadline, and Plaintiff's delayed notice on September 14, 2018). Plaintiff argues that Defendant has failed to meet its burden of demonstrating prejudice and does not reach the issue of whether he acted reasonably in failing to give notice earlier. (*See* Pl.'s Resp. Def.'s Mot. J. ("Pl.'s Resp.") at 6, ECF No. 21, "The fact [Plaintiff] did not explain why he submitted his claim in September 2018 . . . is immaterial. . . . Because [Defendant] has not met its burden of proving prejudice, there is no basis to address the 'second inquiry' under *Lusch*[.]'"; Pl.'s Mot. at 3, 29-30, asserting that Defendant "fails on the first inquiry" because it has not met its burden of demonstrating prejudice; Def.'s Resp. Opp'n Pl.'s Mot. J. ("Def.'s Resp.") at 8, ECF No. 20, addressing the second inquiry and stating that "[t]here is no evidence [that Plaintiff's] delay was reasonable") (bold omitted).

Given this posture, the Court's inquiry turns on whether Defendant has met its burden of demonstrating prejudice as a result of Plaintiff's delayed notice. After noting that Plaintiff's "claim is based entirely on Dr. Lewis's assessment of [Plaintiff's] self-reported symptoms," Defendant argues that it suffered prejudice due to Plaintiff's delayed notice because (1) it was "deprived [of] the opportunity to conduct a timely IME, interview with [Plaintiff,] or interviews with any witnesses," and (2) its "medical consultants advised [that] there was no other corroboration for [Plaintiff's] claim and that an interview, tests, or an IME after September 2018

---

that proof of claim be submitted within one year from when disability began." (*Id.* at 25.) Defendant, however, acknowledges that even if Plaintiff missed this deadline, which is undisputed here, Defendant still bears the burden of demonstrating that Plaintiff's late filing prejudiced Defendant. (*See id.* at 1, 23, addressing Defendant's burden with respect to its "late notice defense").

would not provide meaningful data on [Plaintiff's] cognitive abilities in 2016 and 2017." (Def.'s Mot. at 23.)

Defendant has failed to meet its burden of demonstrating prejudice. As an initial matter, Defendant claims that is suffered prejudice because it was not able to conduct contemporaneous interviews (i.e., interviews on or around Plaintiff's alleged onset date of August 9, 2016) with Plaintiff or "any witnesses." (*Id.*) A lack of contemporaneous interviews did not prejudice Defendant, as it is clear that it remained able to "adequately investigate" and "accurately and fairly review the claim[.]" (*See* Admin R. Ex. A at 1110; Def.'s Mot. at 2, reflecting that Defendant's second denial letter and pending motion described the relevant inquiry in these ways); *see also Carl*, 918 P.2d at 863 (describing the first inquiry as "whether the insurer has been prejudiced by that late notice because notice was not received in time for the insurer to make a reasonable investigation and adequately . . . protect its interest and that of the insured") (citations omitted).

To be sure, Plaintiff provided Defendant with medical records pre- and post-dating his alleged onset, contemporaneous reports from Plaintiff and medical providers, retrospective reports from Dr. Lewis and Plaintiff, Dr. Lewis's detailed discussion of and citation to supporting medical literature, guidelines, and studies, and an employer statement addressing Plaintiff's disability, "very limited" duties, and periods of medical leave and limited capacity work. Although it claims prejudice due to a lack of contemporaneous interviews, Defendant's denial letters suggest that it received significant and probative contemporaneous evidence, as it placed considerable emphasis on Plaintiff's medical records from the day of the accident, the traffic accident and insurance report that Plaintiff completed the day after the accident and later submitted to the Oregon Department of Motor Vehicles ("DMV"), and Plaintiff's and

Dr. Lewis's reports regarding an overseas business trip that Plaintiff took a few days after the accident. (*See* Admin. R. Ex. A at 1108-1113, denying Plaintiff's claim based, in part, on Defendant's assessment of Plaintiff's hospital records, DMV report, and post-accident discussions with Dr. Lewis). Defendant also declined Plaintiff's offer to participate in an interview and provide retrospective testimony, even though it could have sought relevant information and evaluated the consistency between Plaintiff's after-the-fact testimony and contemporaneous reports. (*See id.* at 1111-12, stating that an interview would not provide "time relevant" information).

Furthermore, nothing in the record indicates that Defendant even attempted to obtain certain information from Plaintiff's employer, such as contemporaneous records or emails or post-accident records documenting changes in Plaintiff's work performance or behavior or "cognitive abilities in 2016 and 2017." That is significant because the record suggests that relevant information was available to Defendant. (*See, e.g.*, Admin. R. Ex. A at 1089, reflecting that Plaintiff informed Dr. Lewis that in June 2017, Neofocal's co-founder and "major investor" resigned from the company and "*expressed in writing* that [Plaintiff's] behavior had changed since his August 2016 car accident, creating an intolerable situation and the need to sell the company and/or its remaining assets") (emphasis added). Defendant's failure to request such relevant information undercuts its claim of prejudice based on a lack of contemporaneous interviews.

The Court also notes that disability-related reports are "inevitably rendered retrospectively." *See Witney v. United of Omaha Life Ins. Co.*, No. 2:20-cv-01273-RAJ, 2022 WL 4483179, at *10-11 (W.D. Wash. Sept. 27, 2022) (conducting a de novo review, noting that the defendant questioned the value of and weight that should be accorded to a nurse's and

counselor's "after-the-fact" and "untimely" statements in support of the plaintiff's LTD claim, and stating that "[i]t is obvious that [disability-related] medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis" (quoting *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988))); *Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 711 n.11 (C.D. Cal. 2020) (noting that the defendant characterized evidence as "not time-relevant" but "[i]t is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis" (quoting *Smith*, 849 F.2d at 1225)). That is especially true where, as here, it is undisputed that it could take at least several months for anyone to know if an mTBI event has resulted in symptoms that persisted beyond the typical timeframe for recovery and thus equated to persistent post-concussive syndrome or PPCS. (*See* Admin. R. Ex. A at 1023, 1082, reflecting that Dr. Lewis used these terms and stated that "[t]he literature would suggest that minimally 15% of persons with concussion may experience persisting symptoms beyond the typical 3 month time frame [for full recovery]" and the "[f]unctional outcomes after mTBI are extremely diverse" but "the effects of [TBIs] . . . , including concussion injuries, are *cumulative*"; *id.* at 1047, showing that Dr. Crawford noted the concern for "cumulative injury" and stated that most, but not all, "individuals [with an mTBI] resolve to baseline within three months").

Defendant's records at times suggest that to be "time relevant," Plaintiff's evidence must be from the typical three- or four-month window for recovery. (*See id.* at 1046-47, demonstrating that Defendant and Dr. Crawford characterized "8/9/16-12/10/16" as the period they considered "time-relevant" with respect to whether "[a] current [July 2019] IME" would sufficiently address Plaintiff's restrictions and limitations due to "post-concussive syndrome," even though Defendant's referral questions also encompassed the period "beyond" December 10, 2016; *cf. id.*

PAGE 29 – FINDINGS AND RECOMMENDATION

at 1107-16, reflecting that in its second denial letter, Defendant focused on its ability to assess whether Plaintiff could perform his regular occupation "as of August 9, 2016" or "as of his reported date of disability," but did not describe what equated to "time relevant" information, other than noting that evidence "after the date [Plaintiff's] claim was filed" or "from September 14, 2018 through the present" would not be "time relevant"; Def.'s Resp. at 2, characterizing the "relevant time frame [as] the period immediately after the accident, or as soon as practic[al]"). However, it is undisputed that a PPCS diagnosis is based on whether the patient exhibited symptoms and deficits beyond the typical three- or four-month window for recovery.

 Defendant also claims prejudice because its medical consultants "advised that testing and assessment had no diagnostic benefit more than a year out," and thus there was "no meaningful way for [Defendant] to independently assess [Plaintiff's] cognition when he claims disability began." (Def.'s Mot. at 27.) Notably, however, Defendant does not dispute or fails adequately to address these facts:

(1) some mTBI patients do not recover within the typical time period;

(2) Plaintiff's diagnosis is PPCS, the term used to describe patients who do not recover in the typical time period and exhibit persistent symptoms and deficits;

(3) Plaintiff "suffered a significant TBI in August 2006," but eventually recovered;

(4) although Plaintiff recovered from his initial TBI, his 2012 brain MRI confirmed "persistent clinical sequelae of TBI following left posterior head impact [in] 2006" and "localized cortical volume loss, consistent with sequelae of prior posterior head injury";

(5)     the "effects of [TBIs], including concussion injuries, are *cumulative*" and

        can leave a patient who recovered from an initial TBI "far more vulnerable

        to suffering new, renewed or worse impairment(s) from any subsequent

        TBI, even if that second TBI is 'mild'";

(6)     "patients can be concussed by the forces imparted to the brain by sudden

        acceleration/deceleration, as in a car accident in which they remain seat-

        belted in the vehicle and the head does not strike any solid object";

(7)     Plaintiff was diagnosed with a cervical strain after being rear-ended on

        August 9, 2016 and subsequently reported the "new development" and

        "return[]" of his "old symptoms," some of which are "the most common

        symptoms seen in patients with PPCS" and were "persisting";

(8)     a closed head injury diagnosis "may be made based on account of physical

        injury without imaging studies or cognitive testing";

(9)     the VA/DoD guidelines reflect that there is "insufficient evidence for

        recommending routine . . . cognitive or neuropsychological testing for the

        diagnosis of mTBI compared to diagnosis based on history and physical

        only," and "recommend against" using such testing in routine diagnosis

        and care; and

(10)    CT scans and MRIs are "*usually* normal in concussed patients" and

        "usually fail to detect evidence of structural brain abnormalities in mTBI."

(*See* Admin. R. Ex. A at 280, describing Plaintiff's post-accident diagnoses; *id.* at 888-91, 1019-

33, 1081-89, documenting Dr. Lewis's opinions and reliance on supporting literature, studies,

and guidelines regarding mTBI, PPCS, cumulative injury, and Plaintiff's history; *id.* at 1046-49,

1097-98, reflecting that Dr. Crawford acknowledged that some patients do not return to "baseline within three months," "MRI[s] of the brain in persons reporting symptoms of post-concussion syndrome are often normal," the "Home Depot incident," and Dr. Lewis's "concerns [about] cumulative injury"; *id.* at 857, showing that Dr. Kim's letter to Dr. Lewis stated that it was "[o]f note" that Plaintiff's 2012 brain MRI "noted persistent clinical sequelae of TBI" and "localized cortical volume loss, consistent with sequelae of prior posterior head injury"; *id.* at 1082, 1084-85, 1112, noting that Defendant and Dr. Lewis acknowledged that Plaintiff improved and returned to work after his initial, "significant" TBI and Plaintiff's past reports of similar symptoms; Def.'s Mot. at 28, agreeing that a closed head injury diagnosis need not be based on "imaging studies or cognitive testing").

Given these facts, some of which are discussed further below, Defendant has failed to meet its burden of demonstrating prejudice. Defendant characterized certain evidence as not "time relevant," even though it would have addressed whether Plaintiff's symptoms and deficits persisted beyond the typical time period for recovery, and if so, when and whether they ever resolved. Defendant also failed to seek additional "history" relevant to Plaintiff's disability claim.

Defendant's reliance on its inability to perform testing within a few months or a year of Plaintiff's accident is undermined by its medical consultants' own observations and failure adequately to address or explain why their testing-related opinions differ from Dr. Lewis's and the authorities he relied on. For example, Dr. Crawford, who did not address the authorities Dr. Lewis relied on, acknowledged concerns related to cumulative injury, that some patients do not return to "baseline within three months," and that "MRI[s] of the brain in persons reporting symptoms of post-concussion syndrome are often normal." (*See* Admin. R. Ex. A at 1046-49,

1097-98.) Dr. Crawford, however, fails to explain why additional tests were necessary or why, in the absence of or need for head trauma and based on "a few weeks" of symptoms and this record, she would have "anticipated" a "referral for MRI or neurological evaluation to rule out structural causes such as delayed cerebral edema, ischemia, hydrocephalus, or subdural hematoma." (*Id.* at 1047-8.)

Additionally, the Court notes that the Plan requires a claimant to submit "proof of claim," not "proof of a potential claim," no "later than one year after the date [his] disability begins," and encourages the claimant to "notify [Defendant] of [his] claim as soon as possible so that a claim decision can be made in a timely manner." (*Id.* at 1114.) Given the definition and clinical nature of PPCS and cumulative effects of TBIs, a claimant's "proof of claim," as opposed to a potential claim, will not exist for at least several months after the underlying injury or accident and the period that follows remains relevant to whether the claimant's symptoms and restrictions resolved.

Defendant's claim of prejudice is based on its inadequately explained characterizations of what was or was not "time relevant," "timely" or sufficiently "contemporaneous" to Plaintiff's claim. Notably, Defendant's records suggest that if Plaintiff had notified Defendant of his claim by August 9, 2017, "multiple actions would have been taken to determine [his] work capacity," including "[c]ontemporaneous" telephone calls or interviews with Plaintiff and Dr. Lewis, the "[a]cquisition of all contemporaneous medical records from primary sources," and a "[t]imely neurological or neuropsychological IME." (*See id.* at 1047, reflecting that Dr. Crawford stated that these actions would have been taken if Plaintiff had "filed timely (between 08/09/16-08/09/17)"; *id.* at 1112-13, demonstrating that Defendant's second denial letter relied on the statements from Dr. Crawford's opinion in asserting that Plaintiff's delayed filing prevented

Defendant from taking "time relevant" actions). It is not clear how telephone calls, interviews, document acquisition, or examinations that occurred by August 9, 2017 would be "timely," sufficiently "contemporaneous," or "time relevant" with respect to a continuous, post-August 9, 2016 disability claim due to PPCS and Plaintiff's ability to perform certain duties of his regular occupation on and after August 9, 2016, but would not be so on or around September 14, 2018.

Indeed, Defendant could have obtained much of the same information in September 2018 as August 2017, and presumably, would have wanted to know, among other things, whether Plaintiff's symptoms resolved at any point within or after the typical three- or four-month window for recovery. A September 2018 MRI could have also revealed the absence of changes when compared to Plaintiff's December 2012 MRI. (*See id.* at 857, 964, showing that Dr. Kim and Defendant noted the December 2012 MRI findings and "lack of imaging of the brain since [the] date of disability"; Def.'s Mot. at 15, noting the absence of "imaging to compare"; *cf.* Admin. R. Ex. A at 947, reflecting that Dr. Selkirk supported his opinion with the incorrect statements there was a post-accident CT scan, which "reportedly showed no acute abnormality"; *id.* at 1048, reflecting that Dr. Crawford noted there was no post-accident "order [for] a CT brain").

Defendant emphasizes that Plaintiff's coverage ended on August 21, 2017, and Plaintiff's delayed filing prevented Defendant from "conducting an adequate investigation in late 2018 of what his cognitive abilities may have been between August 9, 2017 and August 21, 2017." (Def.'s Mot. at 2, 26-27.) Defendant's letters, however, did not cite any August 21, 2017 cutoff date when it denied Plaintiff's claim initially and on review.[3] (*See* Admin. R. Ex. A at 962-68,

---

[3] Defendant acknowledges that like the administrative process, the Court's de novo review encompasses the "entire record." (Def.'s Reply Supp. Mot. J. ("Def.'s Reply") at 19, ECF No. 25.) The Court also notes that Plaintiff claims ongoing disability as of August 9, 2016, not

1107-16.) That is significant because "a district court cannot adopt post-hoc rationalizations that were not presented to the claimant . . . during the administrative process." *Collier*, 53 F.4th at 1188.

As the record cites herein demonstrate, Defendant's letters and records reveal that its "time relevant" period was a moving target. For example, in its initial denial letter, Defendant represented that Plaintiff's "late filing ha[d] prejudiced [it] from evaluating his disability," Defendant "would have likely recommended a referral for neuropsychological testing" if Plaintiff's claim "file were reviewed in late 2016 with the record submitted," and a "neuropsychological IME done now/currently [i.e., April 2019] would be able to provide information regarding [Plaintiff's] current functional capacity" but "would not be able to determine [Plaintiff's] functional capacity starting from August 9, 2016 forward[.]" (Admin. R. Ex. A at 963-644; *see also id.* at 904, reflecting that Dr. Kim also referenced "file . . . review[] in 2016").

By comparison, Dr. Crawford concluded that if Plaintiff had "filed timely (between 08/09/16-08/09/17)," Defendant would have taken "additional actions . . . to determine [Plaintiff's] working capacity," including "[c]ontemporaneous" telephone calls or interviews with Plaintiff and Dr. Lewis, the "[a]cquisition of all contemporaneous medical records from primary sources," and a "[t]imely neurological or neuropsychological IME." (*Id.* at 1047.) At the same time, Defendant and Dr. Crawford framed "8/9/16-12/10/16" as the period they considered "time-relevant" with respect to whether "[a] current IME" would sufficiently address Plaintiff's PPCS restrictions and limitations as of the identified time period, even though the referral questions also encompassed up to August 9, 2017 and an indeterminate time "beyond" December

that disability began after August 21, 2017. (*See id.*, "[D]isability that began after August 21, 2017 is not covered.").

10, 2016. (*Id.*) More recently, in its second denial letter, Defendant focused on its inability to assess whether Plaintiff could perform the necessary duties of his regular occupation "as of August 9, 2016" or "as of his reported date of disability," but did not describe what equated to "time relevant" information, other than noting that evidence "after the date [Plaintiff's] claim was filed" or "from September 14, 2018 through the present" would not be "time relevant." (*Id.* at 1107-16; *see also* Def.'s Resp. at 2, characterizing the "relevant [prejudice] time frame [as] the period immediately after the accident, or as soon as practic[al], up to when the insurer received notice").

Simply put, the evidence does not support Defendant's purported claim of prejudice and decision to deny Plaintiff's claim on that basis. *See generally Collier*, 53 F.4th at 1188 (explaining that on de novo review, a district court "evaluates the plan administrator's reasons for denying benefits without giving deference to its conclusions or opinions," and is "within its province to review the administrative record and determine whether the evidence supported th[e] decision"). Defendant's explanations and failure to seek additional information demonstrate as much. At all relevant times, Defendant was able adequately to investigate and fairly review Plaintiff's claim.

For these reasons, Defendant has failed to meet its burden of demonstrating prejudice. Accordingly, the Court recommends that the district judge deny Defendant's motion on this ground.

### B.    Plaintiff's Burden

The next issue to address is Defendant's argument that Plaintiff has failed to meet his burden of demonstrating that he was disabled under the Plan's terms. (*See* Def.'s Mot. at 2, 30-33, "Even if the Court were to excuse the late notice, judgment for [Defendant] is required

because [Plaintiff] did not prove his claim for benefits under the [P]lan."). Plaintiff has met his burden.

During oral argument, Defendant represented that the only issue before the Court is whether or not there was a reasonable disability investigation that yielded proof that Plaintiff's symptoms were disabling—in particular, whether or not Dr. Lewis conducted a reasonable investigation, which is relevant to the Court's weighing of the record evidence. In support of its claim that there was not such an investigation, Defendant emphasized its view that Dr. Lewis demonstrated a lack of curiosity, the fact that Dr. Lewis relied to a large extent on Plaintiff's self-reports, and the absence of tests to confirm Dr. Lewis's finding that Plaintiff is credible. Defendant also explained that Dr. Lewis's diagnosis and relevant expertise are not at issue.

At the outset, the Court notes that Defendant never offered Plaintiff's lack of credibility as a ground for denying his LTD claim (*see* Admin. R. Ex. A at 962-68, 1107-16), and therefore a determination of Plaintiff's credibility is not part of the Court's de novo review. *See Collier*, 53 F.4th at 1188. Dr. Lewis explained why he found Plaintiff's self-reports to be "clinically credible and consistent with the current medical understanding of cumulative TBI and its cognitive effects," why it is important to pay "careful attention . . . to the possibility than an individual patient may exaggerate or over report symptoms and/or symptom severity," and how he found "no evidence of such over-reporting or exaggeration" during his years of treatment. (Admin. R. Ex. A at 891, 1033, 1089); *see also Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (observing that a clinical interview is an "objective measure[]"); *cf. Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 873 n.3 (9th Cir. 2008) (explaining that "[w]hile the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, . . . [Ninth Circuit] Social Security precedents are relevant for the[ir] factual

observation[s]," which are "true for [both] ERISA beneficiaries . . . [and] Social Security claimants").

The Court also emphasizes that Plaintiff alleges disability based on PPCS and the cumulative effects of TBIs and concussion injuries. (*See* Admin. R. Ex. A at 1082, explaining that this point "cannot be emphasized highly enough"). The record provides ample and objective support that Plaintiff suffered a significant TBI in 2006 and, as a consequence, was "left far more vulnerable to suffering new, renewed or worse impairment(s)" from even a "mild" second TBI or concussion. (*Id.*; *see also id.* at 857, 964, reflecting that Defendant and Dr. Kim observed that Plaintiff's 2012 brain MRI "noted persistent clinical sequelae of TBI" and "localized cortical volume loss, consistent with sequelae of prior posterior head injury"). The record also suggests that mTBI evaluation is focused on a patient's personal and clinical history and whether there has been a decrement in their cognitive status or executive function from their personal baselines. (*Id.* at 1027.) Given these facts and Dr. Lewis's history, his recent mTBI investigation was reasonable. *See Tam*, 491 F. Supp. 3d at 710 ("Unum's doctors' focus on the lack of objective evidence was improper because [the condition here] is not established through objective evidence.").

Notably, Dr. Lewis's opinions and observations are consistent with other courts' and commentators' observations, and when taken together with the other record evidence, are sufficient "proof" of Plaintiff's claim:

> . . . . Medical professionals agree that there are various levels of TBI, including a wide spectrum of mild TBI. The severity of TBI is typically defined at the time of the initial injury but the severity of the injury defined initially does not necessarily predict the trajectory or natural history of TBI, as individuals diagnosed with mild TBI can experience ongoing impairment. Here, for example, multiple doctors noted that [the petitioner] suffered more severe symptoms and suffered longer than a typical mild TBI patient would.
>
> . . . .

> . . . . There is no agreed-upon definition of m[ild] TBI or concussion, because there is no consensus on objective criteria for defining and diagnosing this type of injury. Rather, m[ild] TBI currently remains a subjective clinical diagnosis based primarily on patient history and observable behavioral symptoms. . . . It is not surprising that [a] spectrum of symptoms exist[], considering the diverse ways in which a brain injury can happen, as well as the different brain structures that could be affected by the external trauma. . . . [T]herapy for brain repair is controversial; the type of care the individual should receive during recuperation is not agreed upon.

*Couret-Rios v. Fire & Police Emps.' Ret. Sys. of City of Balt.*, 227 A.3d 637, 653-54 (Md. 2020)

(simplified); *see also Rodman v. Deangeles*, 47 N.Y.S.3d 747, 750 (N.Y. App. Div. 2017)

(explaining that "negative scans were not out of the ordinary" in concussion cases because

"usually no . . . injury can be seen on a CT scan," there was testimony that "the majority of

concussions do not show up on imaging," a "concussion, by its very definition, is a subjective

diagnosis," a "concussion diagnosis is a clinical diagnosis that necessarily relies on a patient's

subjective complaints, as well as the patient's medical history and certain inclusion criteria," and

"clinical observations of a plaintiff's limitations may constitute objective evidence") (citation

omitted); *Chavarria v. Indus. Comm'n of Ariz.*, No. 2 CA-IC 2017-0002, 2017 WL 4176202, at

*5 (Ariz. Ct. App. Sept. 21, 2017) ("[A]lthough [the doctor whose opinion the administrative law

judge adopted] stressed that he did not 'find any objective evidence of any . . . neurological

dysfunction,' he acknowledged that post-concussive syndrome is a clinical diagnosis attended by

a 'constellation' of subjective symptoms. Indeed, as . . . [another] neurologist[] explained,

'[s]ometimes post-concussive syndrome does not show up on any type of scan, CT or MRI

scan.'"); *id.* (observing that a primary care physician explained that "you can't really tell by a

CAT scan or MRI scan if someone has got post[-]concussive syndrome," post-concussive

syndrome is "a clinical diagnosis," and "there's something that goes on in the brain that's not

real easy to see or measure that causes changes over a long period of time, including months and

years or maybe even decades later, as . . . seen in some of the sports-related [cases] that have

come up"); *Ilarda v. Chater*, No. 95-cv-02180, 1996 WL 389366, at *15 (E.D.N.Y. July 8, 1996)

(holding that the plaintiff was entitled to disability benefits and noting that "[a]lthough the ALJ

was correct in stating that [the treating physicians'] findings were not supported by 'objective

evidence,' . . . the nature of post-concussion syndrome is such that objective findings are not

always available").

Defendant argues that its medical consultants are deserving of more weight than

Dr. Lewis's opinions and supporting record evidence. The Court disagrees. Dr. Kim merely

stated that she was "[u]ncertain" about Plaintiff's restrictions and limitations and "unclear

[about] whether [Plaintiff] was/is precluded from [August 9, 2016] forward from performing

[relevant regular] occupational duties[.]" (Admin. R. Ex. A at 904; *see also id.* at 857, stating as

much to Dr. Lewis). Defendant's second consultant, Dr. Selkirk, failed to recognize this fact and

thus incorrectly stated that "Dr. Kim[] opined that there was no evidence to support that

[Plaintiff] was precluded from work . . . from [August 9, 2016] forward" and he "[c]oncur[red]"

with this opinion. (*Id.* at 947.) Although his brief, two-page April 4, 2019 opinion offered his

own "independent analysis and . . . conclusions," Dr. Selkirk also cited a post-accident CT scan

of Plaintiff's brain, which "reportedly showed no acute abnormality," in support of his analysis

and conclusions. (*Id.* at 948.) No such evidence exists. (*Cf. id.* at 964, showing that in its initial

April 24, 2019 denial letter, Defendant stated that the "[t]he currently available records do not

contain any diagnostic imaging of the brain since August 9, 2016"; *id.* at 1048, reflecting that on

July 24, 2019, Dr. Crawford explained that "[w]hile not offered as proof of [the] absence of

symptoms, the file does not contain evidence the [emergency room] providers were sufficiently

concerned about [a] possible brain injury based upon their clinical evaluation to order a CT [of

Plaintiff's] brain").

These facts, coupled with the evidence and observations above, including those pertaining to Dr. Lewis's long-term treatment and detailed explanations and the nature of the claim at issue, suggests that Dr. Kim's and Dr. Selkirk's opinions are deserving of less weight than Dr. Lewis's opinions.

The same can be said with respect to Dr. Crawford's opinion. Dr. Crawford merely "noted" Dr. Lewis's "concerns [related to] cumulative injury" post-"Home Depot incident," and summarily disregarded such concerns because Plaintiff's "extraordinary cognitive capacity as detailed by Dr. Lewis's narrative is consistent with a high cognitive reserve, which would be anticipated to serve [Plaintiff] well when considering the cognitive demands [of his regular occupation of CEO]." (*Id.* at 1097.) This statement appears to be arbitrary and fails adequately to address a potentially claim-determinative issue. It also fails to recognize that Dr. Lewis's narrative was related to why he finds Plaintiff credible and does "not strike [him] as the sort of person who enjoys not working" and would feign disability. (*See id.* at 1089, showing that Dr. Lewis stated that Plaintiff "derives enormous life satisfaction from the exercise of his very substantial intellect," it "appears to [him] that [Plaintiff] has (unsuccessfully) tried to work," and he "very much suspect[s]" that Plaintiff would be working if he could do so).

Based on these facts and on this record, the Court finds that there was a reasonable disability investigation and Plaintiff met his burden of demonstrating that he was disabled under the Plan. Accordingly, the Court recommends that the district judge deny Defendant's motion on this ground.

### C.    Remedy

Defendant argues that the Court should remand Plaintiff's claim because Defendant needs to determine (1) "whether the Plan's 24-month limit on benefits for disability due to [m]ental [i]llness applies," and (2) "the dates [Plaintiff] was disabled and working part-time and

his income during that time, so [Defendant] can apply the Plan's benefit reduction formula to the monthly benefit amount in the affected months." (Def.'s Mot. at 33.) Defendant adds that it "did not consider the Plan's [m]ental [i]llness coverage because even if the claim [was] covered[, Plaintiff] did not prove he was disabled," Defendant "has not reviewed the evidence to determine whether" the mental illness limitation applies because it "was not at issue," the mental illness limitation "issue is not before the Court," and the "benefit adjustment issue" was similarly "not at issue before [Defendant] for the same reason and [thus] not before the Court for review." (*Id.* at 33 & n.1.)

Plaintiff responds that Defendant never offered any mental illness-related limitation as a ground for denying his claim, and emphasizes that Ninth Circuit case law demonstrates that a claim administrator cannot assert a new rationale for the first time in litigation. (Pl.'s Resp. at 26.) With respect to the Plan's benefit reduction formula, Plaintiff responds that "it is a simple and standard matter for [Plaintiff], through counsel, to provide documentation of such income streams, as is routinely done in virtually every ERISA disability case after entry of judgment." (*Id.* at 27.)

The Court declines Defendant's request to recommend a remand. Plaintiff's claim is based almost exclusively on PPCS-related symptoms, Plaintiff's claim application papers included secondary diagnoses for, among other things, a mood disorder, and Defendant never offered a mental illness-related limitation as a ground for denying Plaintiff's claim. (*See* Admin. R. Ex. A at 63, 962-68, 1107-16.) Defendant cannot assert a new rationale for the first time in litigation. *See, e.g.*, *Collier*, 53 F.4th at 1186 (noting that the Ninth Circuit has "held that [a] plan administrator [cannot] assert [a] new rationale for the first time in litigation"). The Court also notes that Defendant's argument is based, in part, on cases where the "administrative record was

inadequate to allow a full and fair assessment of the plaintiff's entitlement to disability benefits." (Def.'s Reply at 30-31) (citations omitted). The administrate record here allowed for a full and fair assessment.

With respect to any benefit reduction, Defendant does not dispute Plaintiff's counsel's claim that the necessary information is routinely (and will be) provided post-judgment. (*See* Def.'s Reply at 32.) Defendant does, however, assert that this is not the "appropriate course," noting that Plaintiff "kept [Defendant] out of the claim process for over two years and now suggests ERISA would have the parties continue to pay lawyers to resolve the application of the Plan's set-off provisions for wages earned while disabled." (*Id.*) The Court finds this argument unpersuasive.

During the administrative process, Plaintiff and Neofocal provided Defendant with payroll records and the dates of Plaintiff's medical leave and limited capacity work. (*See* Admin. R. Ex. A at 47, 269-76.) Plaintiff's counsel also represents that she will provide Defendant with any additional information it needs, as is her customary practice. Thus, there is no need for a remand.

## II.    PLAINTIFF'S CORRECTED MOTION

Consistent with the above findings, the Court recommends that the district judge grant Plaintiff's corrected motion for judgment.

///

///

///

///

///

///

**CONCLUSION**

For the reasons stated, the Court recommends that the district judge DENY Defendant's motion for judgment (ECF No. 17) and GRANT Plaintiff's corrected motion for judgment (ECF No. 19).

**SCHEDULING ORDER**

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 3rd day of July, 2023.

HON. STACIE F. BECKERMAN
United States Magistrate Judge